## No. 1173. ·

### SUCCESSION OF J. C. TAYLOR.

Under the laws of Louisiana the only condition on which a null marriage can produce civil effects, is that it was contracted in good faith by the parties or by at least one of them; in case of the latter, the civil effects can benefit only the party in good faith, and the children born of the marriage.

The good faith of the innocent party must be evidenced by circumstances which indicate a reasonable belief that both parties pretending to contract the marriage were able to marry. Good faith cannot be credited to a woman who marries a man who to her knowledge has a living wife, whom she has seen herself a few months before the pretended marriage, and by whom she had been informed that no divorce had been pronounced between the spouses, and who had been informed a few days before the projected marriage that the man was married and not divorced.

The presumption of good faith must yield to positive proof of the reverse.

APPEAL from the Fifth District Court, Parish of Claiborne. *McClendon*, Special Judge.

*Allen Barksdale* and *W. A. Vanhook* for Opponents and Appellants:

¶1. Persons legally married are, until the dissolution of the marriage, incapable of contracting another. C C. 93.

2. Where a woman had full knowledge that the man she was marrying had a living wife she cannot claim the benefit of good faith based on the supposition that the man was divorced, especially when she failed to use the means immediately at hand to ascertain the truth.

3. Neither party to a putative marriage being in good faith no civil effects are produced by the marriage. 24 Ann. 485.

39	823
45	420

39	823
46	985

39	823
f119	711
119	713

4. When a divorce has been decreed on account of adultery, a marriage between the guil'y party and his accomplice in adultery is null and void, and no civil effects are produced by such a marriage. C. C. 161. Good faith does not come into a case based on this issue.

5. Good faith in respect to marriages is not a mistaken belief as to the legal effect of one's actions or ignorance of the law itself, but consists in the erroneous though reasonable belief in the existence of facts that would make the marriage valid in the eyes of the law. A pardonable ignorance of the existence of facts that render the marriage null, must exist at the time of contracting the marriage. Ignorance of the law will not suffice.

6. Ignorance is not pardonable when the truth is within easy reach of the ignorant party, and she failed to avail herself of the means to ascertain the truth.

7. The applicant in this case could easily have ascertained whether Taylor had been divorced or not, and it was her duty to do so. 38 Ann. 198. Her failure to do so is destructive of her plea of good faith.

*J. A. Richardson, J. R. Phipps* and *J. W. Holbert* for Applicant and Appellee:

A marriage contracted in good faith produces civil effects: C. C. 117 and 118; C. N. 201 and 202; Bishop on Marriage and Divorce, vol. 1, secs 302 and 303.

The burden of proof is upon the party alleging the nullity of a marriage: 24 Ann. 298; 6 Wallace U. S. R., p. 642; 30 Ann. 1297 and 1388; 1 Greenleaf, sec. 81.

A putative marriage is converted into a real one by the removal of the disability; as if there was a former husband or wife living, the marriage becomes good on such person's death or final divorce: Bishop, vol. 1, sec. 302; 1 Ann. 98; 3 N. S. 438; 6 Wallace, 642.

The opinion of the Court was delivered by

POCHÉ, J. The issue presented by the pleadings in the case involve the alleged illegality and nullity of the marriage of the deceased with widow P. J. McFarland, and the alleged illegitimacy of the children born of that union.

Their claim to participate in the property left by J. C. Taylor is resisted on those grounds by four of the heirs, now of age, issue of his marriage with Sarah Castlebury, who is alleged to have been the only lawful wife of J. C. Taylor, who was living and undivorced from him at the time that he pretended to contract marriage with the widow McFarlard, and to the latter's knowledge. Opponents prosecute this appeal from a judgment which decreed Mrs. McFarland and the issue of her union with J. C. Taylor entitled to all the rights and privileges in and to this succession which appertain to the surviving lawful wife and to the legitimate children of the deceased party.

The undisputed facts in the record are as follows:

J. C. Taylor and Sarah Castlebery were lawfully married in 1852, and opponents are the issue of that marriage. In 1865 Taylor and his wife voluntarily separated, but both continued to live in the Parish of Claiborne, a few miles apart, the husband having retained the custody and control of the children.

In July, 1866, Mrs. Sarah C. Taylor instituted a suit for divorce against her husband on the ground of adultery, and in November of the same year judgment was rendered against her. In the meantime Widow P. F. McFarland, who lived and taught school in the same village in which Taylor resided, received the latter's attentions as a suitor for marriage, and accepted his offer of matrimony. On the 9th of December, 1866, accompanied by two or three friends and by a minister of religion, all residents of the Parish of Claiborne, Louisiana, they rode into the State of Arkansas, at a distance of about ten miles from Haynesville, the village in which they lived, where a marriage ceremony, purporting to unite them in lawful wedlock, was performed over them by the minister in question, in accordance with the laws of that State, where a marriage license was not a prerequisite to a legal marriage. From that day, saving an intermission of a few months, they lived together and cohabited as man and wife, and were treated as such by their friends, neighbors and acquaintances down to the death of J. C. Taylor, in December, 1886.

In February, 1867, Mrs. Sarah C. Taylor brought a second suit for divorce against J. C. Taylor, grounding her demand on the alleged adulterous life which he was then leading with his pretended wife under the Arkansas marriage ceremony, and in November, 1867, judgment was rendered in her favor, granting her a full divorce against Taylor.

As, in the opinion of Mrs. McFarland, Taylor was completely liberated by that divorce, she called on him for a second marriage ceremony, which would legalize their union. But he either differed from her, or he simply procrastinated, whereupon she became dissatisfied and left him, returning to her relatives in the State of Tennessee where she remained from July to December, 1868. At Taylor's instance, she returned to him, and on January 24, 1869, a second marriage ceremony was performed over them, this time at their home in Haynesville, and preceded or authorized by a license obtained and issued in accordance with the forms of law.

During the whole time which intervened between the voluntary separation in the summer of 1865 of J. C. Taylor from his wife, Sarah Castlebery, to the date of the second marriage ceremony between him and Mrs. P. F. McFarland, the former constantly resided at her father's house, at a distance of six miles from Haynesville, where she occasionally went for the purpose of seeing and visiting her children at J. C. Taylor's house. It also appears that on several occasions, during Taylor's absence, she remained at that house with her children until

his return, and for several days. All these facts and circumstances were well known to Mrs. McFarland, who met Mrs. Taylor on three distinct occasions, and who made her acquaintance with full knowledge of her true character and condition. The record shows that on one occasion the two met at Taylor's own house, and while he was there himself, and that they had a conversation together. This last occurrence took place some few months previous to the Arkansas marriage ceremony. Mrs. Sarah Taylor is yet living and gave her testimony on the trial of this case.

As stated above, these facts are not denied or disputed by counsel for appellee, who concede also that the marriage ceremony of December, 1866, was an absolute nullity. But their contention is that the marriage, although null, was contracted by Mrs. McFarland in good faith, under the belief that at that time Taylor was divorced from Sarah Castlebery. Hence they claim protection under the provisions of articles 117 and 118 of the Civil Code, which read respectively as follows:

" The marriage which has been declared null produces nevertheless its civil effects as relates to the parties and their children, if it has been contracted in good faith."

" If only one of the parties acted in good faith, the marriage produces its civil effects only in his or her favor, and in favor of the children born of the marriage."

They quote numerous decisions of this court, in which these two articles of the code were construed favorably to the claims of the issue of putative but null marriages.

The purport of these decisions is to practically consecrate and apply the principle incorporated in the two articles of the code. Whenever the record showed that in such marriages one of the contracting parties honestly believed that both were able to contract, and was honestly ignorant of the incapacity of the other, the court invariably extended the protection of the law to the innocent party who had been deceived, and to the still more innocent children born of the marriage. The question therefore resolves itself into an inquiry into the good faith with which Mrs. McFarland contracted the marriage of December 9, 1866, and suggests a special analysis of the reasons which she had to believe that Taylor had been divorced from his wife, Sarah Castlebery.

Assuming the rule to be that her good faith must be presumed, and that the burden of proof is on opponents to rebut that presumption, the record shows to our entire satisfaction that Mrs. McFarland knew

at the time that Taylor had a living wife from whom he had never been divorced, and that therefore she did not contract that marriage in good faith. We have made a thorough examination and a careful study of all the cases in our jurisprudence which have a bearing on the question herein discussed, and we find that the facts presented in all the cases in which relief was granted under the provisions of articles 117 and 118 of our code were strikingly different from the circumstances disclosed by the record in this case.

In the case of Clendenning vs. Clendenning, 3d New Series Martin Reports, p. 438, there was no proof that the woman who contracted the putative marriage had any knowledge of the pre-existing marriage, and much less of the existence of the first wife, who lived in the State of Tennessee, at a time when communications and mail facilities between that State and Louisiana were not equal to those of the present day. The only suspicious circumstances shown against the second wife's good faith was the testimony of a single uncorroborated witness, who stated that he had been introduced to the wife by the husband as being acquainted with the latter's wife in Tennessee, but as it was shown that the introduction was made in a language which the wife did not understand, the testimony carried no weight in the minds of the judges of the court.

In the case of Patton vs. Philadelphia et al., 1 Ann. 98, the assailed marriage had taken place during the Spanish Colonial Government in Louisiana in the year 1799, between Eleonore Hook, a resident of the colony, and Abraham Morehouse, who represented himself as the widower of Abigail Young, whom he had married in New York in 1790; and there was no proof that Eleonore Hook had any reason even to suspect that the wife of Morehouse was living at the time that she consented to marry him. At that time the means of communication between New York and the then District of Ouachita were not as easy as they are now between New York and Europe.

The case of Abston, 15 Ann. 137, presented the instance of a third marriage by a man whose first wife was yet living in the State of Alabama, and whose existence was unknown to his third victim.

In the case of Navarro, 24 Ann. 298, the court had to deal with the effects of a marriage contracted by a man who had a living wife in Italy, with a woman who was entirely ignorant of his previous marriage, and much more of the existence of his wife in Europe. Our immediate predecessors, in the case of Barfield, 30 Ann. 1297, gave civil effects to a marriage contracted between a man who had a wife living in the State of Mississippi and a resident of Louisiana, who had never

heard of the previous marriage, and who believed in the validity of her marriage with a man who had lived at her father's own house as a single man, and who was reputed to be such.

Greatly different are the circumstances with which Mrs. McFarland was surrounded on the 9th of December, 1866!

She was the teacher of some of the children of Sarah Castlebery and J. C. Taylor, whom she had seen but a few months before with their mother in Taylor's own house. She knew that Sarah Castlebery was living at a distance of but a few miles from her own residence, and on the records of the court of the parish in which she lived there stood a judgment denying the coveted divorce between Taylor and his wife. No one of the numerous witnesses, all residents of the village, who testified in the cause had ever heard even a rumor that Taylor had been divorced from his living, legal wife, and the only reason which appellee holds out in support of her belief in a divorce was derived from the assurances of Taylor himself. But even as to that her own testimony is not conclusive. Her statement in that connection is as follows: "When he proposed to go to Arkansas to marry, I asked him if he was all right, referring to the divorce he had told me of, and he answered yes, or he would certainly have made no such propositions." Confessedly she received no such information from anybody else, and her case depends upon the legal conclusion that such a circumstance is sufficient to show her belief in good faith in the existence of a divorce. If such trust can be placed in the declaration of the man who seeks to deceive a woman into a reprobated marriage, it would be difficult to conceive of a case in which the woman could not be held to have acted in good faith. Such a conclusion would open the flood-gates of legalized concubinage, and the courts in their eagerness to protect the innocent offspring of null marriages would thus lend a helping hand to the destruction of the respectability of society by sapping the only safe foundation of the purity of the family.

But the record discloses more recklessness on the part of Mrs. McFarland in her matrimonial venture. In her conversation with Mrs. Sarah C. Taylor, in the summer of 1866, at Taylor's own house, she inquired of the latter about the divorce, and she was informed that the marriage had not yet been dissolved. Can a stronger case be imagined? Was not that information more than sufficient to make it her imperative duty to seek for reliable information before yielding her consent to marry Taylor?

But without any efforts on her part, the information came to her through two of her lady friends, who both cautioned her against such

a step. One of those friends told her that Taylor was not divorced, and the other conveyed the very significant information that Taylor had been refused a license for the projected marriage on the ground that he was not a single man or able to contract a legal marriage; and both communications were made to her but a few days preceding the matrimonial trip to Arkansas. And we are satisfied that that was the motive and the sole reason of the trip to that State, in company with the minister who could otherwise and so easily have performed the marriage ceremony at her own home, and in the midst of her neighbors and friends.

We conclude from the record that Mrs. McFarland's conduct in marrying J. C. Taylor in Arkansas, in December, 1866, was not characterized by good faith in law, and that in cohabiting with him thereafter she became his accomplice in adultery.

Hence we conclude that the pretended marriage between them in January, 1869, was stricken with the nullity pronounced in article 161 of the Civil Code, which reads:

"In case of divorce, on account of adultery, the guilty party can never contract matrimony with his or her accomplice in adultery, under the penalty of being considered and prosecuted as guilty of the crime of bigamy, and under the penalty of the nullity of the new marriage."

It follows therefore that neither of the pretended marriages between Taylor and Mrs. McFarland could produce any legal effects, and that the judgment appealed from is manifestly erroneous.

In their opposition appellants have prayed for the appointment of an administrator in the event of the recognition of the asserted rights of Mrs. McFarland and her children, and the District Judge had made an order to that effect. Under our conclusions that order must be vacated.

It is therefore ordered, adjudged and decreed that the judgment of the District Court be annulled, avoided and reversed, and it is now ordered that the application of Mrs. P. F. McFarland in her own right, and on behalf of her minor children, to participate in the property belonging to the succession of J. C. Taylor be rejected and dismissed, at her costs in both courts, and that the order of the lower court appointing administrators for said succession be vacated at the costs of the applicants for said administration.

Judgment reversed.