## EVANS et al. v. EUREKA GRAND LODGE, FREE AND ACCEPTED MASONS, etc., et al.

### No. 4568.

Court of Appeal of Louisiana. Second Circuit.

June 30, 1933.

Rehearing Denied July 15, 1933.

Lewell C. Butler, of Shreveport, for appellant.

Phanor Breazeale, of Natchitoches, for defendant Lodge.

Charles J. Mundy, of New Orleans, for appellee.

TALIAFERRO, Judge.

This suit is between the surviving children of James T. Evans, deceased, viz., Olivia G. Evans, James T. Evans, Hattie Evans, and Gertrude Evans Watkins, issue of a legal marriage by him to Mariah Brown, and Addie Kendall Evans, alleged putative wife of the deceased, James T. Evans. The Most Worthy Eureka Grand Lodge, Free and Accepted Masons for the State of Louisiana and Jurisdiction, Inc., is also a defendant. This defendant will be hereinafter referred to as the lodge. The amount in controversy is $300, the proceeds of a death benefit policy issued by said lodge to James T. Evans, on January 27, 1912, when he was admitted to membership therein. The second wife was designated as beneficiary in this policy and described as the wife of the insured. When this suit was filed the lodge deposited the amount of the policy in the registry of the court and prayed that it be paid to the person or persons entitled to it.

The lower court gave judgment for plaintiffs, and Addie Bell Kendall Evans appealed.

There is little dispute about the material facts of the case.

The insured married Mariah Brown, who survived him, in Terrebonne parish on August 22, 1889. Two years later they moved to Jefferson parish, and then moved to the state of Texas. While living there, in the year 1904, Evans sent his wife and five children back to their kinsfolk in Louisiana with instructions to there abide until they heard from him. He never advised his family thereafter. However, his wife, then living in the city of New Orleans, in the year 1912, learned that he was living with the defendant, Addie B. Kendall, as his wife, in the city of Shreveport, La. The record does not disclose how this information reached her.

The deceased, under the assumed name of Julius J. Evans, married Addie Bell Kendall in the city of Shreveport on October 4, 1905, and they lived happily together as man and wife until his death in Chicago, June 13, 1932, while attending the Republican National Convention as a delegate. One son was born to them. He, at the age of 24, predeceased his father.

About the time the first wife learned of her husband's Shreveport marital relations, their son Lawrence was taken ill and died in New Orleans. The father went there to be with him during his illness. On this visit his wife accused him of being married and living with a woman in Shreveport. He denied the charge and stated that search could be made at Shreveport and no record would be found showing that "James T. Evans" had married there. The first wife then wrote letters to the second wife wherein she imparted to her the fact of the first marriage, the issue thereof, and deceased's perfidy. These letters were not offered in evidence. Their contents may be easily deduced from the replies thereto (in letter form) made by defendant. The first reply follows:

"Shreveport, La., March 29, '13.

"Mrs. Mary Evans.

"Dear Madam: Your letter of the 28th was received and noted. In the discourse, you stated, that, *I* had married a married man. Of course, he once having been a married man and divorced from his former wife,

matters little to me, but if he is not a divorcee it *does* matter. I certainly didn't know it at first, and would now appreciate your kindness if you would tell me in details, that he is not. In fact, I would like to know the whole story of the case.

"Please write me the whole story in detail by 'return mail' after which I'll make further investigation.

"And oblige, Yours respectfully

"[Signed] Mrs. J. J. Evans."

Defendant testified that after writing this letter she also wrote a woman friend in New Orleans, giving sufficient facts of the case to enable her to have investigation made of the records there to ascertain if Evans had contracted a first marriage in that city, and that she was advised by this woman that such investigation had been made and nothing was found to support the charge that "Julius J. Evans had been married there to Mariah Brown." No search of the Terrebonne Parish records was made. Defendant says this information, together with Evans' protestations of innocence, satisfied her that there had been no previous marriage by him, but the following letter by her to the first wife certainly discloses that she was convinced beyond any doubt of the bigamous nature of her marriage to Evans:

"Shreveport, La., Apr. 3, '13.

"Mrs. Mary Evans.

"Dear Madam: I am in receipt of your letter, and in reply will say, that I am certainly *shocked* at the outcome of this episode. Though he has proved a good provider and husband being fifteen years my senior, I am perfectly willing to give him a divorce in order that he may again be a husband and father for you and children.

"Though I've been a true and loyal companion in assisting him in business day by day, helped to cultivate his standard to a higher plane; and then he has lived a life of deception and ingratitude by misleading me, I am willing to let the past bury its dead and begin life anew for me and my child.

"I am a woman that believes in assisting the fallen and lending a helping hand to one that is clamoring for assistance. And yet, while I find it impossible to go to New Orleans to hear the story for myself, I sincerely wish your son a speedy convalescence and the broken ties of your once *happy* home a joining and binding that will last henceforth and forever.

"Yours truly,

"[Signed] Addie Kendall Evans."

In this letter she rather freely poured out her heart's feeling to the unhappy, mistreated first wife, and expressed a willingness to co-operate in a plan to restore Evans to her and his lawful children. She admits that he deceived her. Evans evidently did not concur in this attitude, for he remained in Shreveport until his death. He visited his family in New Orleans occasionally after his son's death there in 1913.

The matter remained quiescent until this litigation arose.

There can be no doubt of the good faith of defendant in marrying Evans. At that time she had no information to lead her to believe, or even suspicion, that she was being deceived into a bigamous marriage contract with him. After learning the true facts from the first wife, the situation changed, and from that time on she was in utter bad faith and can blame no one but herself for her discomforting experiences thereafter, with all their embarrassing results.

Defendant was educated at Tuskegee Institute for colored people and took postgraduate work at other colleges. She taught in the public schools of Caddo parish from 1914 to 1932. It is shown that she and Evans moved in the best social circles of her race in Shreveport, and were well thought of by their many white friends. She testified that she would not have married Evans had she known he had a living wife from whom he had not been divorced, nor would she have lived with him after marriage if she had been convinced of his deception. Being educated and having had unusual opportunities for one of her race to intelligently weigh and consider facts affecting her social and moral welfare, it is surprising she did not follow her first impulses when informed of the previous marriage, living wife, and children, of the man who had deceived her. It was her duty to have followed up the information by making a complete and thorough investigation to learn the true facts. Her station in life, and the desire to right a wrong to which she was an innocent party, should have impelled her to such a course.

She visited the city of New Orleans in 1920, but admits that she did not then interest herself about the serious charges made against Evans by the first wife, did not interview the accuser, and made no effort whatever to check up on the information given her in 1913.

The law measurably protects the innocent party to a bigamous marriage so long as his or her good faith continues. It ceases this benign attitude the moment the innocent party becomes wise to the facts and does not avail himself or herself of the opportunity to prove good faith by disavowing a contract to the execution of which he or she has been induced by fraud and deception.

■ A putative marriage produces its civil effects in favor of the party thereto who is in good faith. C. C. arts. 117, 118; Waterhouse v. Star Land Co., 139 La. 177, 71 So. 358.

Section 6 of Act No. 256 of 1912 provides that payment of death benefits by any association created under that act shall be confined

to "wife, husband," et al.; and this court held in Smith v. Grand United Order of Odd Fellows, 17 La. App. 532, 136 So. 124, that a putative wife, dependent upon the insured for support, had an insurable interest in husband's life and was entitled to collect the proceeds of a policy of life insurance in effect when he died, wherein she was named beneficiary.

In the present case the policy had its inception at a time the beneficiary was in good faith. It was kept alive by payments by the insured for 20 years thereafter, and the benefits thereunder devolved at a time when the beneficiary was in bad faith. She had no vested interest in or right to the policy because of the fact that she was named beneficiary therein. Section 6, Act No. 256 of 1912; Farrow v. Grand United Order of Odd Fellows, 16 La. App. 100, 133 So. 188.

The rights and interest of the beneficiary in a life insurance policy are inchoate, suspensive, and indeterminate until devolution thereunder, in fact and law, takes place.

Our jurisprudence abounds with cases involving the rights of widows and children of a putative marriage, but we find none wherein the facts are on all fours with the present one. If the policy had issued after the wife's bad faith had come into existence, or if the insured had died before such bad faith on her part, there would have been no difficulty in finding an abundance of authority to support rejection of her claims in the first instance, and approval of same in the second. Be this as it may, we do find that in many cases stress is laid upon the fact that rights and statii acquired *only while the deception lasts* are protected and recognized by the law.

In Clendenning v. Clendenning et al., 3 Mart. (N. S.) 438, wherein the question of rights of children of a bigamous marriage contracted in good faith by the wife was involved, the court said:

"There seems to be no dispute on the question of law. The woman, who was deceived by a man, who represented himself as single, and his children begot while the deception lasted, are bona fide wife and children, and as such, entitled to all the rights of a legitimate wife and issue.

"It is, however, shown that the first child was born within four months from the celebration of the marriage. This may be evidence of too much faith in the mother, but as a lawful marriage, cures an irregularity of this kind, a bona fide one on the part of the deceived woman, must have the same effect.

"It is next urged, that the other children, four of them, were born after the deception ceased, and consequently the good faith of the mother had ceased. If this be the fact, the plaintiff must, as to such children, succeed. For it is the duty of the deceived woman, as soon as she became satisfied with

the existence and consequent rights of the first wife, to forbear a violation of them."

This language is, in part, quoted with approval by the court in Waterhouse v. Star Land Co., supra. If the children born of a marriage reprobated by law, after the wife ceases to be in good faith, are to be branded with total illegitimacy, and deprived of the right to inherit as children from their mother because of her immoral conduct and bad faith, a fortiori does it follow that such a mother would forfeit all rights as beneficiary under a policy of life insurance carried by the husband by continued cohabitation with him after knowing their marriage to be bigamous and void.

In Patton et al. v. Cities of Philadelphia & New Orleans, 1 La. Ann. 98, it was held:

"By the Spanish law, children begotten after both parties know with certainty of the existence of an impediment to their marriage, are illegitimate. Aliter, as to children begotten while both, or one of the parties was ignorant of such impediment, or while a doubt existed in the mind of either as to the fact of any impediment."

In Hubbell et al. v. Inkstein et al., 7 La. Ann. 252, the court again considered and discussed the rights of a putative widow, and said, inter alia:

"Being of opinion that there is nothing in the record to show that Mary Inkstein ceased to be in good faith, *before the death of Julius Hubbell or until long afterwards*, we consider her entitled to the rights of a lawful wife, and it becomes necessary to ascertain what those rights would be. ✱ ✱ ✱

"In the case of Patton v. The Cities of Philadelphia and New Orleans, in many respects similar to the present, we held, that under the former laws of the country, where a man married two wives, *and the second wife was in good faith at the death of the husband, each took one-half of the community property*. Hubbell died after the repeal of those laws. *But the principle upon which they rested, appears to us clearly deducible from those now in force; and the reasons of the law, as stated in Patton's Case, have equal force under both systems.*" (Italics ours.)

The Clendenning and the Patton Cases, quoted from supra, are referred to approvingly in Succession of Taylor, 39 La. Ann. 823, 2 So. 581.

Other cases might be cited wherein it is at least intimated, if not expressly held, that the civil effects of a putative marriage cease when the deceived wife is disillusioned concerning the right of the husband to lawfully marry her; and wherein it is held that if the wife in such a marriage is in good faith to the death of the husband that it produces the same effect, so far as concerns the widow and children, as does a legal marriage.

The lower court held that defendant was

in bad faith after she was advised in 1913 of her husband's first marriage, and that she could not claim any benefits, as beneficiary, under the insurance policy on Evans' life, and we agree with him.

Judgment in favor of the plaintiffs is affirmed, with costs.