**HOWARD v. INGLE et al. (INGLE, Intervener).**

No. 5514.

Court of Appeal of Louisiana. Second Circuit.

Jan. 3, 1938.

Rehearing Denied Jan. 28, 1938.

R. W. Oglesby, of Winnfield, for appellant.

Eugene Beck and Harry Fuller, both of Winnfield, for appellee.

TALIAFERRO, Judge.

Jerome Bonaparte Ingle departed this life September 28, 1935, after attaining the ripe old age of 109 years. He died intestate but

left a small succession consisting of personal property, including cash and real estate in Winn parish, La., his domicile for nearly a half century.

The first introduction the district court of Winn parish had to the existence of the succession was through a suit for a partition of its assets, in part, by licitation, instituted by Mrs. Sarah Howard, child of deceased's alleged first marriage, against his other six children, or their descendants, coheirs of Mrs. Howard. The partition, as prayed for, was ordered and the property duly advertised for sale, pursuant to the terms of the court's decree. Before the sale was had, however, intervener, now residing in Ouachita parish, became wise to the status of the succession affairs and provoked the present controversy by judicially asserting and seeking recognition of her alleged rights as the surviving widow in community of the deceased. All differences among the several heirs, as regards settlement of the estate, were apparently composed by them, and doubtless having faith in the adage "that in union there is strength," joined hands in resisting the demands of the present Mrs. Ingle, who alleges:

That she married Jerome Bonaparte Ingle in Winn parish on July 18, 1920; that the marriage was only dissolved by the death of said Ingle; that each asset of his succession was acquired during the existence of said marriage, fell into and became a part of the community of acquets and gains superinduced thereby, and that, as surviving widow, one-half interest in all of said acquired property devolved upon her as owner, the moment her husband died. She prays to be recognized as the surviving widow in community of deceased, and for an order directing the sheriff of Winn parish to hold in his hands the proceeds of the sale of the succession property, then being advertised; and, finally, that one-half thereof be adjudged to belong to and ordered paid over to her. She also prays that S. J. Harper, who, it is admitted, has in his hands the $900 belonging to the succession, be also ordered to pay to her such part thereof as she may be adjudged entitled to. The sale was called off.

Defendants in intervention specially deny that intervener has any right, title, or interest in the Succession of Ingle, and in like manner, deny that she was his lawful or putative wife. They aver that Jerome Bonaparte Ingle was legally married but once, and then to the mother or grandmother of defendants, and that she died on June 20, 1928, nearly eight years subsequent to the alleged marriage of deceased to intervener; that said first marriage was never dissolved by divorce; that if it be shown that deceased and intervener attempted to contract a marriage, in such event, defendants "allege that intervener and third opponent was in bad faith and that she had actual knowledge that the said Jerome Bonaparte Ingle had at the time a living wife from whom he was never legally separated or divorced." They aver additionally that deceased and intervener lived together in such bigamous relation only a few weeks; and that the property left by deceased was acquired subsequent to their voluntary separation; that intervener ceased to live with the deceased immediately upon learning that on his death she would not receive any part of the pension then being paid him by the Federal Government, because she would not be his lawful widow. Intervener's demands were rejected and she appealed.

▆ Ingle settled in Winn parish about 1885. ·He was then living with Emeline Sermons, by whom he had seven children. The couple had formerly resided in Claiborne parish, and Mrs. Howard, a daughter, testified that her mother told her that they contracted marriage there. After the birth of the children, Ingle and wife, for reasons not disclosed, became estranged and never thereafter resumed conjugal relations. This separation occurred prior to the year 1905. He continued to reside in Winn parish. She lived alternately with her children, and died at Selma, La., as alleged, on June 20, 1928. Shortly after said separation, Ingle and a Mrs. Morgan took upon themselves the relation of husband and wife in and about Winnfield, and this relationship continued until the death of the latter, the date of which is not shown. This record does not contain ·any positive evidence that the cohabiting of this couple was preceded by a marriage ceremony. She was held out by Ingle as his wife. As they both lived in Winn parish, it is reasonable to assume that if a marriage between them was contracted, the evidence of it would be in that parish. None was found. Defendants assert that they were not married. Intervener visited in the home of this couple in Winnfield quite often, waited on the lady when sick, assumed she was the lawful wife of Ingle, and attended her funeral. Nothing occurred over this experience to affect her belief and opinion that Mrs. Morgan was the lawful wife

of Ingle; and, naturally, on her death, she conclusively presumed he was in a position lawfully to contract marriage; and, while in this state of mind, she married him. She knew Ingle had grown children, not by Mrs. Morgan, but did not know their mother; nor did she have any knowledge of her existence, or of the separation between her and Ingle. In view of these facts and circumstances, she was not called upon, as a condition to her good faith, to institute a searching inquiry into Ingle's past domestic and marital affairs.

The lower court found that intervener was in absolute good faith in contracting this marriage. We are wholly in accord with the finding. Defendants do not seriously assail this conclusion, but do seriously assert and argue that within a few weeks after her marriage, intervener was made wise to the fact that Ingle's first wife was living and that their marriage bonds had not been dissolved. They argue that from the date of this knowledge intervener ceased to be in good faith and, as regards property accumulated by Ingle subsequent thereto, her status is not that of a putative wife; and, further, that since all the property of which deceased died possessed was acquired subsequent to this knowledge, intervener is without any right or interest therein. The lower court sustained this contention.

Intervener and Ingle lived together but five weeks and four days. They were married in the home of one of his grandchildren near Winnfield. The first three weeks of this brief honeymoon was spent in the residence of one of Ingle's sons. The balance of their cohabitation was spent in the home of a friend in same community. She says the children of this home bothered him and he "got mad and moved out." He was then over ninety years old. He drove away in his own one-horse wagon. She saw little of him thereafter.

The deceased was an honorably discharged Union soldier. He also saw military service in an Indian war. He drew a pension from the Federal Government on account of such services. Pension payments began about 1893 and continued to his death, at which time he was receiving $100 monthly. He reposed implicit confidence in the honesty of Mr. S. J. Harper, a citizen of Winnfield, and intrusted to him the keeping of his cash money. Harper testified that a few weeks after intervener's marriage to Ingle, she came to his store and requested him to give her $25 from Ingle's funds,

and that he declined to do so without specific authority from him; that in the course of their conversation, she stated that she would get the pension when Ingle died, to which Harper replied:

"I said not. 'This is a Federal Pension and,' I says, 'he has never been divorced from his first wife'; and she says, 'If I am not going to get it, I am not going to live with him then.' "

The following question was asked Mr. Harper, viz.:

"How do you know that he never got a divorce from his first wife?"

To which he replied:

"Well, he had a son, Cater Ingle, he was a good old fellow and kinder peculiar, and somehow Cater and him had a little difference, and Cater threatened to turn him in about living with another woman and not being divorced from his first wife, and I told Cater I wouldn't do it if I was him. I told him 'You could put him in jail, and that would be all' he could do to him; and I talked him out of it. That is the way I got my information."

█ He admitted he had no first-hand information touching the marital relations of Ingle prior to adoption of Winn parish as his home. Intervener denied emphatically the conversation to which Harper testified. No effort was made to prove a marriage between Emeline Sermons and Ingle, beyond the fact that they lived together as man and wife for several years, brought children into the world, reared them, and then parted permanently. These acts serve as a basis for the presumption of marriage. Of course, their own children believe they were married, but not one of them testified to having seen a record of it in a family Bible or elsewhere. If the marriage occurred in Claiborne parish, as Mrs. Howard thought, surely there is a record of it there. It is not shown that any search was made to locate first-hand evidence of this alleged marriage. It is established that neither side sued for divorce. This inaction may reflect, inferentially, the reason neither resorted to the courts for relief. It seems passing strange that Ingle's children and grandchildren would receive and accept the Morgan woman as the wife of their father and grandfather, unless they thought their relation above reproach. It is still more strange that they would approve, without protest, his marriage to intervener if they believed him bound by the ties of marriage

to their mother. As said before, he married in the home of a granddaughter and spent three weeks thereafter in the home of his son Cater, whom Harper says told him of the existence of the first marriage. And, in addition, it is inconceivable that Ingle would lay himself open to a prosecution for bigamy by contracting an illegal marriage in the very community where he and his children (several of them) lived and had lived for over forty years, and in which their mother often visited, to the time of her death.

Defendants have failed to prove to that degree of certainty required of them, under the issues of the case, the existence of a marriage between Ingle and Emeline Sermons. The burden rested upon them to do this. Succession of Young, 166 La. 285, 289, 117 So. 150; In re Nereaux's Estate, 112 La. 572, 36 So. 594.

We could entirely rest judgment in the case upon this one conclusion, but prefer to consider and pass upon the alternative issue of the putative character of intervener's marriage to Ingle. Of course, if it has not been established that Ingle was lawfully married to Emeline Sermons, the issue of bad faith charged against intervener passes out of the case entirely.

The burden of proof to sustain a charge of bad faith on the part of a marriage contractant rests squarely upon the person making the charge. Good faith is always presumed. Succession of Navarro, 24 La.Ann. 298. This presumption, as relates to marriages, has much in common with that of innocence which attends a person charged with a criminal offense until overcome by convincing proof. Second only to certainty of proof of the alleged bigamous marriage, the evidence must show with reasonable certainty the existence of the prior marriage which is the very foundation basis of this charge.

Article 117 of the Revised Civil Code reads:

"Putative Marriages. The marriage which has been declared null produces nevertheless its civil effects as it relates to the parties and their children, if it has been contracted in good faith."

The "good faith" referred to in this article has often been defined by the courts.

In Smith v. Smith, 43 La.Ann. 1140, 1149, 10 So. 248, 250, it is said:

"The good faith referred to means an honest and reasonable belief that the marriage was valid, and that there existed no legal impediment thereto."

And in Ray v. Knox, 164 La. 193, 197, 113 So. 814, 815, anent this question, the court stated:

"And the rule was correctly laid down in Patton v. Cities of Philadelphia & New Orleans, 1 La.Ann. 98, and has ever since been followed, that where a man marries, and afterwards contracts a second marriage without the first having been dissolved, the community property acquired during the co-existence of said two marriages belongs exclusively and in equal shares to said two wives as long as the second wife is in good faith, i. e., as long as she has no certain knowledge of the existence of the first marriage, and the bigamous husband has no share whatever in said property. Cf. R. C. C. art. 117, supra. * * *

"For the 'good faith' required in matters of putative marriages has nothing whatever to do with the morals of the putative wife or husband; that 'good faith' requires only that the party contracting such marriage should have no certain knowledge of any impediment thereto. See Patton v. Cities of Philadelphia & New Orleans, supra."

It is made clear by these expressions of the court that the innocent party to a bigamous marriage is held to be in good faith so long as he or she has "no certain knowledge of any impediment thereto." This status ceases when the innocent spouse is impressed with certain knowledge of the impediment. Evans v. Eureka Grand Lodge, La.App., 149 So. 305, and cases therein cited.

To convert the good faith which exists at time of the marriage to bad faith thereafter, it seems to us would require knowledge of such impediment of a stronger degree of certainty.

Can it be said that the statement by Mr. Harper to intervener, based upon what Cater Ingle told him, constitutes that "certain knowledge" necessary to stamp intervener thereafter as being in bad faith? We do not think so. It was rank hearsay, and had intervener followed it up by instituting an investigation, she would probably not have found more on the subject than this record discloses; and we have found that the alleged marriage of deceased to Emeline Sermons has not been established by a preponderance of the evidence introduced in the case.

■ Defendants contend that the pension paid to deceased for services rendered his country in time of need, prior to his marriage to intervener, became his separate property; and that the real estate purchased since the marriage did not become community assets because paid for from the pension fund. The deeds to Ingle simply state that the considerations thereof were paid in cash. No reference is made to the source, origin, or nature of the funds which went to pay the prices, and regardless of the character of such funds, the property is legally deemed to have fallen into the community of acquets and gains. R.C.C. art. 2405. This presumption is not rebuttable. Succession of Goll, 156 La. 910, 101 So. 263, Succession of Andrus, 131 La. 940, 60 So. 623, Bostwick v. Thomson, 149 La. 152, 88 So. 775, Atkins v. Cason, La.App., 170 So. 366.

■ We are also of the opinion that all the personal property of this succession belongs to the community. It is presumptively of this character. Schwab v. Hava et ux., 154 La. 922, 98 So. 420. We do not think the proceeds of the pension checks in the hands of Mr. Harper fell into the community. The right to the pension arose, and favorable action of the Government on deceased's application therefor occurred, long prior to his marriage to intervener. Since the marriage, she rendered no service which to any extent or in any manner contributed to its continued payment; nor could she have done so. Once granted, payments thereunder became automatic.

Rev.Civ.Code, art. 2402 in part, is as follows:

"This partnership or community consists of the profits of all the effects of which the husband has the administration and enjoyment, either of right or in fact, of the produce of the reciprocal industry and labor of both husband and wife, and of the estate which they may acquire during the marriage, either by donations made jointly to them both, or by purchase, or in any other similar way, even although the purchase be only in the name of one of the two and not of both, because in that case the period of time when the purchase is made is alone attended to, and not the person who made the purchase."

■ The most common of community property is that which is acquired by the joint efforts or industry of the spouses. Joint action by them is presumed so long as the marriage bond exists, but in the instant case, by no strength of the imagination can it be said that this pension fund was acquired or accumulated by the joint efforts of the spouses. Only one case having any bearing on this question has been cited. It is that of Hughey et al. v. Barrow, 4 La.Ann. 248. After diligent search, we find no other. The title to a grant of land was therein involved. During the existence of the matrimonial community the husband purchased a settlement right on public lands of the United States, and after dissolution of the community, the Government made to him individually a donation of the land, on account of the settlement by the party from whom he had purchased. It was held that the property did not fall into the community, but became exclusively that of her husband. The syllabi of the court, in part reads, viz.:

"The rule that things given by the sovereign formed no part of the community, but belonged exclusively to the party to whom they were given, applied to all cases except where the donation was in remuneration for military services rendered to the sovereign by a husband, who had served without pay and been supported by the community."

Under the rule announced in this case, a pension awarded the husband for military services rendered the sovereign would fall into the community, if the husband served without pay and the community supported him in whole or part during the term of the service. The reason for so holding is obvious. The community was being deprived of his services to it, and the remuneration given in satisfaction thereof was but an acquirement of the community, as would be the case had the services been rendered to a private individual.

For the reasons herein assigned, intervener, Mrs. S. E. Ingle, is recognized as the widow in community of Jerome Bonaparte Ingle, deceased, and as such she is hereby adjudged to own in her own right an undivided one-half interest in and to all of the property, real and personal (excepting cash in the hands of S. J. Harper), left by deceased at time of his death, a descriptive list thereof appearing in the inventory and appraisement made in his succession, now open in the district court of Winn parish, and also in the judgment ordering a partition in suit No. 7945, on the docket of said court, styled "Mrs. Sarah Howard v. Quincy Ingle et als.," and to the extent of the above decree, the judgment appealed from is annulled, reversed, and set aside,

but in other respects it is affirmed. Defendants in reconvention are cast for payment of all costs.