114 So.2d 742 (1959)
SUCCESSION of John L. HOPKINS.
No. 4849.
Court of Appeal of Louisiana, First Circuit.
October 1, 1959.
Scallan E. Walsh, Baton Rouge, for appellant.
White & May, Baton Rouge, for appellee.
Before ELLIS, LOTTINGER and TATE, JJ.
LOTTINGER, Judge.
This is a suit by Rosetta Williams Hall, who intervenes herein on behalf of herself and her four minor children, alleging that, as putative wife of the deceased John L. *743 Hopkins, she and her said children, should be sent into possession of a share of the property left by the deceased. The defendants are Sarah Bostic Hopkins, the wife of said John L. Hopkins, and Lillie Mae Hopkins, the daughter of Sarah and the deceased. The Lower Court awarded judgment in favor of defendants and dismissed the suit. The plaintiff has appealed.
The record discloses that John L. Hopkins, deceased, and Sarah Bostic were married in the state of Arkansas during the year 1913. Of said marriage one child, Lillie Mae Hopkins, was born. Sometime during the 1920's John L. Hopkins and Sarah Bostic Hopkins separated from each other, and they continued to live separate and apart until the death of John L. Hopkins in 1947.
Subsequent to the said separation John L. Hopkins moved to the Parish of East Baton Rouge, where he lived with another woman named Bertha. John and Bertha were never married to each other, although they lived together as man and wife for some period of time. On October 31, 1941, while John Hopkins was still living with Bertha, he married petitioner Rosetta Williams in the Parish of East Baton Rouge
Approximately two months prior to the marriage of John and Rosetta, John purchased a certain lot of ground in the city of Baton Rouge for which lot of ground he paid $100 cash prior to his marriage to Rosetta, and the remainder of said purchase price, or the sum of $300, was paid subsequent to his marriage to Rosetta. In the said Act of Sale, which is authentic in form, it is declared that John L. Hopkins, is a married man, whose wife is Sarah Bostic, from whom he has been separated for thirteen years.
Subsequent to the death of John L. Hopkins, Sarah and her daughter were sent into possession of the said lot of ground by judgment of possession rendered by the 19th Judicial Court, Parish of East Baton Rouge on July 11, 1955. It is this judgment which is contested by petitioner in this suit which was filed on July 19, 1955.
The Lower Court, as aforesaid, awarded judgment in favor of the defendants dismissing the petitioner's suit. An appeal was taken to the Supreme Court, and it was subsequently transferred here because of lack of Jurisdictional amount.
There is no dispute to the fact that the marriage between John Hopkins and Sarah Bostic was a legal one, and that Lillie Mae Hopkins was legitimate issue of the said marriage. There is furthermore no evidence in the record which would tend to show that John and Sarah were ever divorced. Therefore, under the laws of this state, Sarah and John remained legally married to each other, until the time of John's death in 1947.
The record discloses that, after the separation between John and Sarah, John moved to the City of Baton Rouge where he lived as a next door neighbor to Rosetta for a period of several years. The evidence discloses that Rosetta lived on one side of a double house and John lived on the other side. A witness by the name of Bud Brown was the neighbor of John on the other side.
While the parties were living as neighbors, John "took up" with a woman named Bertha, and lived with her for a period of time. While he was living with Bertha, he courted Rosetta for a period of about one year prior to their marriage. Apparently John was still living with Bertha when he married Rosetta. The marriage between John and Rosetta was surrounded by the necessary formalities to produce a legal marriage.
The record discloses that Rosetta was aware of the fact that John had been previously married in Arkansas. She had read letters which had been written to John by his daughter, and Bud Brown and Ollie Brown, both witnesses for defendants, testified that they had told Rosetta before her marriage that John had a lawful wife and daughter. There is no question in our *744 minds that Rosetta was aware of this prior legal marriage, although she does claim that John had told her that he was divorced. Rosetta had also questioned John relative to his status with Bertha, and John told her that he and Bertha had never been married.
A short time after the marriage between John and Rosetta, they visited with Sarah and Lillie Mae, the defendants, who were then living in Monroe. In introducing the parties, John introduced Rosetta as his wife and he introduced Sarah as Lillie Mae's mother, or words to the effect that she used to be his wife.
The petitioner takes the position that she is an innocent victim of circumstances; that she contracted a "good faith" marriage with John under the impression that there was no legal impediment to the said marriage. She therefore claims that she should be declared a putative wife of John, and, as such, entitled to a share in his Succession, under the provisions of Articles 117 and 118 of the LSA-Civil Code.
Article No. 117 of the LSA-Civil Code provides as follows: "The marriage, which has been declared null, produces nevertheless its civil effects as it relates to the parties and their children, if it has been contracted in good faith."
Article No. 118 of the LSA-Civil Code provides as follows: "If only one of the parties acted in good faith, the marriage produces its civil effects only in his or her favor, and in favor of the children born of the marriage."
There is no question in our minds but that if Rosetta was in legal good faith in entering into the marriage with John, she should be entitled to the civil effects flowing from the putative marriage as set forth in the Civil Code. These civil effects would continue so long as her good faith remained. However they would terminate upon her gaining knowledge to the effect that her marriage was invalid. Howard v. reka Grand Lodge, F. & A. M., La.App., Ingle, La.App., 180 So. 248; Evans v. Eu-149 So. 305.
What constitutes good faith is a relative quality and depends upon the facts and circumstances in each individual case. Succession of Chavis, 211 La. 313, 29 So.2d 860, 862. In the cited case the court said that the term "good faith" means an honest and reasonable belief that the marriage is valid, and that no legal impediment thereto exists. The court further stated "It may well be that unconfirmed rumors or mere suspicions may reach a party and such as may even cause some question or doubt to arise as to the validity of a marriage, yet it would appear under our jurisprudence that under certain conditions a party may be in `good faith' so long as no certain or authoritative knowledge of some legal impediment comes to him or her, but to just what extent a party is called upon to make an investigation to ascertain whether there exists any legal impediment to his or her marriage in order to establish his or her status as a putative spouse, will depend ultimately upon the facts and circumstances in each individual case. Our courts have simply said that `a party alleging good faith can not close her ears to information or her eyes to suspicious circumstances. She must not act blindly or without reasonable precautions.' For a detailed and lengthy discussion on our jurisprudence on these questions, see: Smith v. Smith, 43 La.Ann. 1140, 10 So. 248; Wiley v. Stewart, 145 La. 1081, 83 So. 260; Miller v. Wiggins, 149 La. 720, 90 So. 109; Ray v. Knox, 164 La. 193, 113 So. 814; Dillon v. Traders & General Insurance Co., La.App., 183 So. 553; Succession of Glover, La.App., 153 So. 496; Succession of Thomas, 144 La. 25, 80 So. 186."
We certainly do not believe that the petitioner herein had such "good faith" as is required by the Civil Code, nor do we believe that she was the innocent victim of circumstances as she claims. The record discloses that while John was living as a *745 neighbor to petitioner, he visited her often, sometimes during the day, and sometimes during the night. On these occasions, he was living as man and wife with Bertha. The record further discloses that, although Rosetta was only nineteen years of age when she married John, she had already given birth to two illegitimate children and was probably pregnant for a third. She had been informed that John had a legal wife, she had read letters from John's legitimate daughter and we certainly do believe that these circumstances were such as to place Rosetta on guard.
Articles 117 and 118 are clear and positive in the requirement that an illegal marriage must have been contracted in good faith by at least one of the parties in order to produce its civil effects. The term "good faith" has been construed to mean an honest and reasonable belief that the marriage was valid. Funderburk v. Funderburk, 214 La. 717, 38 So.2d 502; Succession of Marinoni, 183 La. 776, 164 So. 797; Jones v. Squire, 137 La. 883, 69 So. 733; Eason v. Alexander Shipyards, La.App., 47 So.2d 114; Succession of Chavis, 211 La. 313, 29 So.2d 860; Howard v. Ingle, La. App., 180 So. 248; Brinson v. Brinson, 233 La. 417, 96 So.2d 653; Succession of Pigg, 228 La. 799, 84 So.2d 196; and Succession of Fields, 222 La. 310, 62 So.2d 495.
Now it certainly appears that the petitioner herein was placed upon guard prior to her entering into the marriage with deceased. She had been told by two friends that deceased had a wife. She had read letters from decedent's legitimate child. There is also some testimony in the record which indicates that there might possibly have been some conversation between decedent and petitioner relative to his wife. Certainly, just a short time after their marriage, she knew of his being married when they paid a visit to his wife and daughter. In order to partake of the fruits flowing from Articles No. 117 and 118, the party must be in good faith. This means that the party must have an honest and reasonable belief that the marriage is valid. Under the circumstances of this case we do not believe that petitioner had the good faith which is required by law. She had been told that decedent had a legal wife, and she had every opportunity to check with these friends prior to her marriage to determine whether or not decedent was still married at that time.
Our Supreme Court has said many times that a woman who knows a man has been previously married, is not justified in entering into marriage with him solely on his word alone that he has been divorced from the earlier wife. Succession of Taylor, 39 La.Ann. 823, 2 So. 581; Succession of Thomas, 144 La. 25, 80 So. 186; Prieto v. Succession of Prieto, 165 La. 710, 115 So. 911; Purvis v. Purvis, La.App., 162 So. 239. In the Succession of Taylor the Supreme Court said with respect to the good faith of a woman who married a man relying only on his word that he had been divorced from a former wife [39 La.Ann. 823, 2 So. 583]:
"If such trust can be placed in the declaration of a man who seeks to deceive a woman into a reprobated marriage, it would be difficult to conceive of a case in which the woman could not be held to have acted in good faith. Such a conclusion would open the floodgates of legalized concubinage, and the courts, in their eagerness to protect the innocent offspring of null marriages, would thus lend a helping hand to the destruction of the respectability of society by sapping the only safe foundation of the purity of the family."
In the Prieto case the Supreme Court said [165 La. 710, 115 So. 913]:
"It has been held that where a man is known to be already married, but declares that he has been divorced, such declaration is not even sufficient to create a presumption of good faith on the part of a woman who marries him without further inquiry."
*746 In the case at bar, Rosetta contends that Hopkins had informed her that he was divorced from Sarah. She just took his word for it and made no other inquiry or investigation on the subject. From the facts and jurisprudence cited, we are of the opinion that the facts in this case fail to meet the requirements of a putative marriage as set forth in LSA-C.C. Arts. 117 and 118.
Furthermore decisions of fact made by the trial court should not be reversed except for obvious or apparent error. We find no such error in the record before us; as a matter of fact we are fully in accord with the decision below.
For the reasons hereinabove assigned, the judgment of the Lower Court will be affirmed, all costs of this appeal to be paid by petitioner.
Judgment affirmed.