## Succession of GLOVER. *
### No. 14794.

Court of Appeal of Louisiana. Orleans.
March 12, 1934.

Dart & Dart and H. Grady Price, all of New Orleans, for respondent.

H. J. Agregaard and Theo. Cotonio, both of New Orleans, for appellant.

JANVIER, Judge.

On December 31, 1891, James Washington Glover was married in the city of Bluefields. Republic of Nicaragua, to Helen Olivia Hodgson who at the time of his death in December, 1931, was still living and who had never been separated or divorced from him.

On May 18, 1909, after the issuance by the clerk of court of Harrison county, Miss., of the necessary license, there was performed a so-called marriage ceremony between the said Glover and Athanise Bradda, who also survived him.

The death of Glover in 1931 occurred at his domicile in Bluefields, Nicaragua, and his legal widow, Mrs. Helen Olivia Hodgson Glover, was recognized by the probate court in that jurisdiction as the surviving widow and sole heir of the said Glover, and was ordered sent into possession of his entire estate wherever situated.

Thereupon the said legal widow by power of attorney appointed Mabel Springer as her agent and attorney in fact and authorized her to apply for letters of administration in the parish of Orleans and to administer the succession of the said Glover to the extent of the property found within this jurisdiction.

The application of Mabel Springer for letters of administration was opposed by Athanise Bradda on the ground that the latter was the legal widow of Glover and as such was possessed of superior right to the appointment. This opposition was dismissed and the applicant thereupon qualified as administratrix.

An inventory showed that there was within this jurisdiction as the property of the succession the sum of $1,250.83, being cash in the savings department of a bank in this city.

The administratrix thereupon filed a final

*Rehearing denied April 23, 1934.

account in which she proposed, after payment of the succession debts and legal expenses, to pay to the legal widow, Helen Olivia Hodgson Glover, the balance of the fund, one-half as widow in community and the other one-half as legal heir.

To this account Athanise Bradda filed opposition, and it is from the dismissal of this opposition that the matter is now before us on appeal.

The opposition is in alternative form, opponent claiming first as putative wife in community that she is entitled to one-half of the fund which is within this jurisdiction and, in the alternative, that if she be not entitled as putative widow in community then that she is entitled to one-half as a "creditor" of the estate, asserting that the fund resulted from the joint efforts of herself and the said Glover in commercial ventures in which they were for many years engaged and into which ventures certain separate funds belonging to her are alleged to have been invested.

We first consider the claim of the opponent that, as a putative widow in community, she is entitled to one-half of the fund left in bank in the name of Glover. In determining whether in a particular situation a person has acted in good faith it is always of assistance to first investigate the evidence which throws light upon the question of the veracity of the person whose good faith is sought to be impugned. Here we find that in most important details statements made by the opponent have been conclusively shown to be totally false. In the first place, she denied that prior to the performance of the ceremony of marriage between herself and Glover she had lived with him in concubinage. The evidence shows conclusively that for some time in Bluefields, prior to the time at which they came to the United States, they had lived together in open concubinage to the knowledge of all of their acquaintances there; so that in this particular she is shown to have deliberately testified falsely.

We next examine the evidence with reference to her having contributed to the so-called partnership the proceeds of the sale of certain separate property which she formerly owned in Biloxi, Miss., and we find that, although she claims she contributed in 1909 $1,000, which she had received from the sale of that property, as a matter of fact, the deed itself shows that the property was not sold until 1921, or 12 years later. Here again her misstatement could not have been due to unintentional error.

Furthermore, in contending that she con-

tributed to the so-called partnership more liberally than did Glover, she testified that when Glover came to the United States he had with him very little money. In fact, as she puts it, "I don't think he had over $500. I will be honest with you I don't think he had over that." The evidence leaves no room for doubt that prior to the time he left Bluefields Glover had been engaged in a lucrative business and had done well and when he came to the United States he had transferred to his credit in this country $5,000 in American money and nearly 800 pounds in English money. The latter, as is well known, would have represented nearly $4,000 in American money, so that at the time at which opponent states Glover was possessed of less than $500 he, in fact, owned and had with him nearly $9,000.

We refer to this evidence merely as tending to show that the opponent is unworthy of belief, and that therefore her statement that she acted in good faith when she married Glover need not be taken at its face value.

But as a matter of law the testimony of opponent herself destroys her claim for recognition as a putative widow in community. She admits that when she was married to Glover in Biloxi, Miss., she well knew that he had already been married and that his first wife was still living. She states that Glover told her that he had been divorced from his first wife, but she admits that she made no further inquiry, "because I taken his word for it."

She had herself been to Bluefields and had lived there for months and had many acquaintances and friends in that city. She did not marry Glover until nearly a year after he had first told her of his fictitious divorce and, during that time, she could easily have communicated with friends in Bluefields and could have learned the truth about Glover's marital status. Her failure to do this and her reliance upon the unverified statement of Glover destroys her contention that she married him in the bona fide belief that there was no impediment and bars her claim to share his estate as a putative widow in community.

The codal article (Civ. Code, art. 117), upon which her claim in this regard was based, requires that the marriage shall have "been contracted in good-faith."

In Succession of Thomas, 144 La. 25, 80 So. 186, 188, is found a case in which it is claimed that a marriage, though null, had been entered into in good faith. The Supreme Court with reference to the so-called putative wife, said: "She knew Mr. Thomas' brother, relatives, and friends, and she could have easily

found out his status in society, if she had chosen to do so."

In a syllabus written by the court in that case, it is said that: "Good faith will not be presumed on the part of a mature woman who enters into a marriage with a man whom she knows to be already married, when she has no evidence of a divorce beyond the assertion of the man whom she says she has married."

As the Supreme Court pointed out in Succession of Taylor, 39 La. Ann. 823, 2 So. 581, 583, if the declaration of the guilty party that there has been a divorce from the first wife may be solely relied upon to establish good faith, then in almost no case will it be possible to hold that there has been legal bad faith on the part of the other party because, nearly always, where there is guilt in such cases there is an attempt at deception, and there is a falsification by the guilty party. We quote from the decision in Succession of Taylor: " 'When he proposed to go to Arkansas to marry, I asked him if he was all right— referring to the divorce he had told me of; and he answered "Yes, or he would certainly have made no such propositions." ' Confessedly she received no such information from anybody else, and her case depends upon the legal conclusion that such a circumstance is sufficient to show her belief is good faith in the existence of a divorce. If such trust can be placed in the declaration of the man who seeks to deceive a woman into a reprobated marriage, it would be difficult to conceive of a case in which the woman could not be held to have acted in good faith."

Counsel for the opponent suggests that the jurisprudence in this regard and from which we have just above quoted has, in effect, been overruled, and that the proper rule is now set forth in a very recent decision of the Supreme Court, to wit, Hondlenk et al. v. John et al., 152 So. 67, in which the civil rights which flow from a putative marriage were recognized.

There the mother of the claimants had married a second time, though her first husband was not dead and though there had been no divorce. But though the death had not in fact occurred, the husband "had not been heard from for several years" and the wife had been advised of his death.

Such a situation presents a different question. In the case at bar the woman who claims to have been in good faith could easily have communicated with persons whom she well knew and could easily have discovered whether there was in existence the court record which would have made certain that there

had been a divorce. In the Hondlenk Case it was not a divorce but a death on which the legality depended, and it is well known that at that time, 1898, vital statistics in smaller southern communities were kept carelessly, if at all, and to prove a death years after its occurrence might have been a very difficult matter. In the case at bar, Glover, himself, had stated that he had been divorced and by questioning him information as to the court in which the divorce was said to have been granted could have been obtained and, by following this information, it could easily have been discovered that the story of the divorce was a pure fiction on the part of Glover.

We find that the cases cited, to wit, Succession of Taylor and Succession of Thomas, are controlling here and require that we hold that the opponent has no claim as a putative widow in community.

When we examine the opposition and the evidence in support thereof we at once discover that though the opponent uses the word "creditor" as representative of her status, she alleges details which, if true, make her not a creditor of the succession, but rather a surviving partner of the decedent.

The ambiguity of the claim in this regard gave rise to the following colloquy between counsel when the matter was tried:

"Mr. Price (Counsel for the administratrix): 'May I ask Mr. Agregaard this question,— whether he is suing as a member of a partnership or merely as a putative wife, or as a concubine who has furnished her money and labor in a business operated by the deceased?'

"Mr. Agregaard (Counsel for the opponent): 'Well, I will answer that by what was said at the beginning of the trial of this case— that I was in on two grounds, either as a putative wife, or if we fall down on that, that we come in as a partner in business, this party here putting her time and money into the running and operation of this business.' "

Though the opposition itself makes it quite clear that the claim of the opponent, although she terms herself a creditor, is really for recognition of interest in a former partnership, if there could be any doubt in that regard the above statement of her counsel makes it certain that she does not claim as a creditor seeking payment of a debt due by the estate, but rather as the actual owner of one-half of the fund which is in the possession of the estate.

It is argued on behalf of the administratrix that no such claim can be made until there

has been a suit for an accounting and also that even where there has been an accounting the claim resulting therefrom cannot be presented by opposition to an account.

Pretermitting a discussion of whether or not there is necessity for an account as a condition precedent to the settlement of the partnership we note that it is very plain that what the opponent seeks is not the repayment to her of a debt, but rather the delivery to her of something which she actually claims to own, to wit, one-half of the fund in bank. She charges that the succession is actually possessed of property belonging to her.

Her claim then is for revendication; for delivery of something she owns.

Such a claim cannot be presented by opposition to an account.

In Cathey v. Kerr, 15 La. Ann. 228, is found a case in which there was opposition to the final account of an administrator. The opponent claimed to be entitled, not as a creditor but as owner, to assets in the hands of the administrator. The Supreme Court said:

"The administrator excepted to the right of the opponent to oppose in this manner, the homologation of the account of administration.

"This exception was properly taken. The account of an administrator is rendered to the creditors and heirs of the estate which he administers. But the opponent and appellant, Lafayette W. Cathey, does not make any claim in either of those capacities. He claims the property which is administered, as belonging to himself, and not to the succession of the intestate. An action of revendication is instituted in the disguise of an opposition to an administrator's account."

Very much to the same effect is Succession of Amelia Sanchez, 41 La. Ann. 504, 6 So. 791, in which, by opposition to a final account, claim was made to certain assets of the succession. In affirming the judgment dismissing the opposition the Supreme Court said:

"This opposition is but a suit for the revendication of property against the Sanchez succession; and opponent's only complaint against the administrator's account is that his demand has not been recognized by the account. It was the duty of opponent to have instituted suit, seasonably, against the Sanchez succession, for the property he demands, if same had been demanded and refused, and to have requested a stay of further proceedings on the account pendente lite, until judgment was pronounced thereon."

For the same reason a similar opposition was dismissed in the Succession of Blancand, 48 La. Ann. 578, 19 So. 683, 684. There we find the following: "The demand asserted by the administratrix of Gustave Blancand, and as tutrix of her minor child, is for property of Gustave Blancand, claimed to be in the possession of the administratrix of Mrs. Josephine M. Blancand. We have examined the ground of the demand, in deference to the earnest argument addressed to us. But, in our view, no such demand has any place in any opposition to the account of the administratrix of Mrs. Blancand. If there was the basis for the demand, in our view, the remedy was of a different character."

It is suggested that if the claim to the fund may not be asserted by opposition to the account the claimant will be without redress, since the fund will be withdrawn from this jurisdiction. If that be true then that is a situation which cannot be altered or affected by this or any other court. We are not permitted to create remedies or to grant rights which our laws do not afford. But it appears to us that since the fund claimed is within this jurisdiction, possibly its removal may be prevented pending determination of the claim properly presented in a suit of a different character. Possibly the method suggested in Succession of Sanchez, supra, had it been followed, may have proven effective. There it will be noted that the court said: "It was the duty of opponent to have instituted suit, seasonably, against the Sanchez succession, for the property he demands, if same had been demanded and refused, and to have requested a stay of further proceedings on the account pendente lite, until judgment was pronounced thereon."

In a somewhat similar situation which was presented to the Supreme Court in Succession of Troxler, 46 La. Ann. 738, 15 So. 153, 156, the court referred to the suggestion which we have quoted from the Succession of Sanchez, using the following language: "Although, in this case, the legality of the succession sale cannot be passed upon, the opposition filed is not without some effect upon that question. In the Succession of Bartlett, 21 La. Ann. 532 (on rehearing), an opposition which was dismissed for want of jurisdiction was none the less held good as a notice; and in Succession of Sanchez, 41 La. Ann. 506, 6 So. 791, the court, referring to the opposition in that case, recognized that accounts could sometimes be properly withheld from homologation to await judgment in another suit, which, when decided, might have a controlling influence on the pending case."

At any rate, and whether there be redress by other means, such a claim as is presented here cannot in this state appear by opposition to an account.

The judgment appealed from is affirmed at the cost of appellant.

Affirmed.