368 So.2d 679 (1978)
Louie A. GATHRIGHT
v.
Talmadge A. SMITH and Margie S. Lawrence.
No. 61289.
Supreme Court of Louisiana.
June 19, 1978.
On Rehearing March 5, 1979.
*681 George M. Strickler, Jr., Paul H. Kidd, Monroe, for defendants-applicants.
Orlando N. Hamilton, Jr., Hamilton, Carroll & Miller, Oak Grove, for plaintiff-respondent.
DIXON, Justice.
Writs were granted in this case to review a decision of the court of appeal affirming a trial court judgment declaring the marriage of relators' mother null and void and rejecting relators' claims to property acquired during the relationship because of their mother's bad faith in contracting the marriage. 352 So.2d 282 (2d Cir. 1977).
The facts of this case, as stated by the court of appeal, are as follows:
"Plaintiff, Louie Gathright, brought suit for a declaratory judgment against Margie Smith Lawrence and Talmadge A. Smith who are the only children and heirs of Clara Pearl Breland Smith (also known as Clara Gathright). He alleged that at the time of his marriage to Clara Smith she was not divorced from either of her two former husbands and was not capable of contracting a valid marriage with him. Plaintiff alleged he was unaware of this incapacity until after her death on January 14, 1973. He further alleged the decedent was in bad faith in contracting the marriage with him, and under La.C.C. Art. 118 she was not entitled to the civil effects of the marriage. Accordingly plaintiff contended the defendants had no rights of ownership in any of the property acquired during the existence of the null relationship.
Defendants denied the nullity of the marriage and sought to show that in any event their mother was a good faith putative wife entitled to the civil effects of the marriage.
The facts show that prior to decedent's marriage to plaintiff in 1942, she had contracted two former marriages. The first to Alexander F. Smith in St. Tammany Parish on April 20, 1920. Defendants were born of this marriage. Shortly after the birth of the second child, decedent and Smith separated. Smith did not obtain a divorce from decedent until March 13, 1963, in Orleans Parish.
On November 4, 1930, decedent purported to marry John Turner in Arkansas and lived with him until 1933 or 1934 when they separated and decedent established her residence in Bastrop, Louisiana. The evidence clearly establishes that on August 12, 1942, when decedent married *682 plaintiff both Alexander Smith and John Turner were living and neither was divorced from decedent.
In a comprehensive opinion, the trial judge held that decedent was in bad faith under La.C.C. Arts. 117 and 118, and declared plaintiff to be entitled to the sole ownership of all property acquired during the null marriage to her." 352 So.2d at 284.
Before this court relators assign five errors by the trial and appellate courts: (1) in the trial court requiring them to satisfy the burden of proving good faith; (2) in the finding by both courts that Louie Gathright was in good faith; (3) in the appellate court holding that a constitutional issue could not be raised for the first time on appeal; (4) in the appellate court failure to find that the burden of proof was unconstitutional; (5) in both courts holding that the burden of proof was not satisfied.
I. Burden of Proving Good Faith
Relators contend that the trial court erred in requiring them to satisfy a burden of proof that their mother was in good faith in contracting a marriage with Louie Gathright.
Inquiry into whether Clara was in good faith [1] is relevant to a determination of whether the civil effects of marriage would run in favor of her and her heirs. C.C. 117. The trial court, relying on Succession of Davis, 142 So.2d 481 (2d Cir. 1962); King v. McCoy Bros. Lumber Co., 147 So.2d 77 (2d Cir. 1962) and Succession of Theriot, 185 So.2d 361 (4th Cir. 1966), held that once Louie put forth proof of the nullity of his marriage to Clara because of Clara's prior undissolved marriages, the burden then shifted to relators, claiming on Clara's behalf, to prove her good faith. This burden, he held, they failed to satisfy.
Relators argue that the burden should not have been on them to prove their mother's good faith but rather that respondent, Louie Gathright had the burden of proving Clara's bad faith. They contend that the cases above cited are inconsistent with Lands v. Equitable Life Assurance Society of U. S., 239 La. 782, 120 So.2d 74 (1960), the case upon which they purportedly rest. Relators interpret Lands to hold that the burden of proving bad faith is always on the party attacking the second marriage; only when bad faith has been established, they allege, does the burden of proving the first marriage was no longer in existence shift to the defender of the second marriage. Their interpretation is erroneous.
In Lands, Pauline Blackwell Lands claimed proceeds from an insurance policy payable to the "widow" of the decedent, Thomas Lands. It was shown at trial that Pauline had been previously married and left her husband, Willie Blackwell, in Mississippi. Eleven years later she married the decedent. She testified that she did not know whether her former husband was living or dead, that she had obtained no divorce from him and was unaware if he ever got a divorce from her, and that she had never seen or heard from him since leaving Mississippi. The district court rejected Pauline's claim and awarded the proceeds of the policy to the brother and half brothers of Thomas Lands, the next beneficiaries in the policy. After quoting extensively from Am.Jur., this court stated:
"We are in full accord with the majority view that a presumption exists as to the validity of a second marriage and that the burden of proof to show that it is a nullity is on the party attacking it. We do not think, however, that this presumption should be available to one who has deserted or abandoned a spouse of a prior marriage in another state and subsequently in this state remarries in bad faith and without reason to believe that the first marriage has been dissolved by death, divorce, or annulment. Whether a party in such a case is innocent and in *683 good faith must depend upon the circumstances and facts of each case, and where innocence or good faith is once established, the burden of proof to show that the first marriage is still in existence is on the party attacking the second marriage. However, in such a case if bad faith is shown, the burden of proof to show that the first marriage was dissolved by death, divorce, or annulment prior to the second marriage is on the party whose marriage is under attack.

We are mindful that as a general rule of law when a man and a woman marry and live together as husband and wife, they are presumed to have contracted the marriage in good faith. As we view the matter, however, for a party to a second marriage to be able to avail himself of the presumption of validity of such a marriage where it is shown that he has deserted his first spouse in another state, he must show that he entered into the second marriage in good faith.

In the condition of the record as made up in the instant case, we are unable to determine with any degree of certainty whether Pauline Blackwell Lands was in good faith at the time she contracted her marriage with Lands, and we have concluded to remand the case in the interest of justice. She left Blackwell in Jackson, Mississippi, but we do not think that we should declare her in bad faith just because she admitted that she did not know as a matter of fact whether Blackwell was living or dead and that she had not obtained a divorce from him. It must be remembered that about 11 years had elapsed between her leaving Blackwell and her marriage to Lands, and during this time she never saw or heard from Blackwell. If she was in good faith and had reasonable grounds to believe that her first marriage had been dissolved, the presumption of the validity of her marriage to Lands would be available and she could rely on it, and the burden of proof would then be on appellees, the brothers, to show that her marriage to Blackwell was still in existence. In the event they should fail to do so, the validity of her marriage to Lands could be presumed and she would be entitled to the proceeds of the policy of insurance as his widow. On the other hand, if she should be unable to show that she contracted her marriage with Lands in good faith, the burden would then be on her to show to the satisfaction of the court that her marriage to Blackwell had been dissolved by death, divorce, or annulment." 239 La. at 790-92, 120 So.2d at 76-77. (Emphasis added).
Hence, the holding of Lands is the following: (1) there is a presumption of the validity of a second marriage and the burden of proving invalidity is upon the party attacking it, (2) the presumption of validity does not run in favor of a spouse who has been shown to have a prior undissolved marriage, unless that spouse can show that he or she contracted the subsequent marriage in good faith.[2] Therefore, the trial judge correctly applied the law by imposing the burden of proving Clara's good faith on her heirs once Louie proved that Clara was previously married and neither widowed nor divorced.
II. Louie's Good Faith
Relators contend that the trial court erred in holding that Louie Gathright was in good faith throughout his marriage to Clara. They refer us to a general rule which has often been expressed by the courts of this State: where a married person knows that his spouse has been previously married, he is not justified in entering the marriage solely on the spouse's word that she is divorced, but he is under a duty to investigate to determine whether the previous marriage was actually dissolved. See Succession of Chavis, 211 La. 313,29 So. 860 (1947); Prieto v. Succession of Prieto, 165 La. 710, 115 So. 911 (1928); Succession of Thomas, 144 La. 25, 80 So. 186 (1918); *684 Succession of Taylor, 39 La.Ann. 823, 2 So. 581 (1887); Succession of Hopkins, 114 So.2d 742 (1st Cir. 1959); Dillon v. Traders and General Ins. Co., 183 So. 553 (1st Cir. 1938); Succession of Glover, 153 So. 496 (Orl.App.1934). The record shows that Clara told Louie prior to their marriage that she was married twice before, but that her first husband died and she was divorced from her second. There is no evidence to indicate that Louie conducted an investigation to ascertain whether, in fact, these two prior marriages had been dissolved.
From the jurisprudence on the subject, we agree with the First Circuit's assessment that the rule stated above "is more a rule of evidence, or a means of weighing the evidence, than it is a rule of law or legal presumption." Dillon v. Traders and General Ins. Co., supra, at 555. In other words, the fact that the party who is informed of a prior dissolved marriage relies on assurances of the dissolution without conducting an independent investigation does not preclude a finding that he was nevertheless in good faith, when there are circumstances to support that conclusion.
In the supreme court cases upon which this rule is based, there were present significant factors that negated any inference of good faith on the part of the individual claiming the status of putative spouse. In Succession of Taylor, supra, for example, the wife had information prior to her marriage that should have led her to believe that her husband's assurances that he was divorced were false. A few months before her marriage she spoke to the first wife who claimed there was no divorce; a few days prior to the wedding she was cautioned by one friend that her intended was not divorced, and another friend disclosed that her fiance had been refused a marriage license because he was not single. Therefore, the court held that this information was sufficient to make it the wife's imperative duty to seek out reliable information of her fiance's marital status before marrying.
In Succession of Thomas, supra, there was no evidence that there ever was a marriage ceremony performed between the decedent and the woman claiming to be his putative spouse. In addition, the woman took inconsistent positions, claiming first that her husband had never been married, and later alleging that if he was once married, he had been divorced; those positions the court found to be "irreconcilable" and "weaken[ed] the testimony of the witness." 144 La. at 30, 80 So. at 188. The court then went on to say that she had access to the information of the man's true marital status by merely asking his brother, relatives and friends. From the opinion, it is clear that the court merely disbelieved her allegations rather than intending to set out a broad rule that investigation is always required.
And in Prieto v. Succession of Prieto, supra, the court found conclusive proof in the record that the husband was aware his wife's previous marriage was undissolved.[3]
The decision in Succession of Chavis, supra, is significant to the instant case. The court acknowledged the rule that there is a duty to investigate when a second spouse knows of the existence of a prior marriage. However held there were "additional reasons why the second wife was led to believe that no impediment existed to her marriage to the deceased." 211 La. at 325, 29 So.2d at 864. Those additional reasons which the court found sufficient to establish her good faith, in spite of her failure to conduct an investigation, were that the first wife who lived in the same community never told the second wife that there had been no divorce, others had told the second wife that her husband had separated from his former wife, and that the facts indicated the *685 second wife had no knowledge or reasonable suspicion of the impediment to the marriage.
In the instant case, Clara's children testified they were aware of the legal impediment to their mother's marriage but concealed that fact from Louie. Further, the record is devoid of any evidence showing that Louie had received information which cast any real doubt on the validity of his marriage to Clara. The issue of Louie's good faith raises a question of fact which must be determined by the trial judge, and his findings are entitled to great weight. We cannot say that the trial judge erred in finding that Louie was in good faith throughout his marriage to Clara.
III. and IV. The Constitutional Issues
Relators urged before the Second Circuit that the burden imposed upon a bad faith wife of a putative marriage (that of "strict and conclusive proof" that she contributed to the funds used to purchase property, and that those funds were obtained independently of the relationship or common endeavor with her putative husband) is an unconstitutional denial of equal protection because it does not apply to the bad faith husband. That allegation was not mentioned in the pleadings nor argued before the trial court but was asserted for the first time before the appellate court. The Second Circuit held that the constitutional issue could not be considered on appeal when not specially pleaded in the trial court.
Our ultimate conclusion is that relators have satisfied the "strict and conclusive proof" burden. Therefore we need not decide whether the constitutional issue is before us, since raised for the first time in the court of appeal;[4] nor whether if before us *686 the burden is unconstitutional because of discrimination against the wife.
V. Satisfaction of the Burden of Proof
Relators further contend that the "strict and conclusive" burden of proof was satisfied.
At issue is the ownership of four pieces (described as five tracts in the trial court judgment) of property located in Morehouse Parish, Louisiana. As stated by the appellate court:
". . . in 1955, decedent and plaintiff moved to California where they acquired two pieces of real property as `joint tenants.' In late 1967, and early 1968, they sold the California properties, and from the money received purchased three pieces of property in and around Bastrop, Louisiana. Those properties were conveyed to `Louie Gathright, a married man whose wife is Mrs. Clara Gathright, nee Breland.' They moved back to Bastrop during 1968, and in 1969 acquired a fourth piece of property which was conveyed to `Louie Allen Gathright and Mrs. Clara Gathright, nee Breland, husband and wife.'. . . " 352 So.2d at 286.
Relators argue that since the funds used to purchase the property in Louisiana were obtained from the sale of the two tracts of California property held by Louie and Clara as "joint tenants," they have shown conclusively that one-half of the funds used to purchase the Louisiana land was Clara's separate property.
The court of appeal held that California law was not applicable since "[t]he rule is well settled that the status of real property is determined by the law of the situs" and "common law joint tenancy rules have no application in determining ownership of real or personal property in this state." 352 So.2d at 286. The validity of this rule of law is undisputed; however, relators' contention is not that the legal status of the Louisiana property is established by California law. Relators' position is that the legal status of the California property will help to determine who owned what portion of the funds that were used to purchase the Louisiana property. If California law determined the status of the property in Louisiana, which it does not, the property would be presumed to be held in joint tenancy, a species of joint ownership foreign to our law.
C.C.P. 1391 (The Uniform Judicial Notice of Foreign Law Act) governs determination of the law of other states:
"Every court of this state shall take judicial notice of the common law and statutes of every state, territory and other jurisdiction of the United States.

*687 The court may inform itself of such laws in any manner as it may deem proper, and the court may call upon counsel to aid it in obtaining such information.
The determination of such laws shall be made by the court, and not by the jury, and shall be reviewable.
A party may also present to the trial court any admissible evidence of such laws, but, to enable a party to offer evidence of the law in another jurisdiction or to ask that judicial notice be taken thereof, reasonable notice shall be given to the adverse parties either in the pleadings or otherwise."
Respondent complains that no notice was provided of relators' intention to rely on California law, nor was there argument to the trial judge of the need to apply California law. Nevertheless, two deeds conveying California property to Louie A. Gathright and Clara Gathright, husband and wife, as "joint tenants" were introduced into evidence, and there was argument by counsel for relators to the effect that the sale of the California property provided the source of the funds used to purchase the Louisiana property. In addition, relators briefed the question of the applicability of California law before the appellate court and again in this court. We find no prejudice from the failure of relators to notify respondent of their intention to rely on foreign law.
The first two paragraphs of art. 1391, provide us with the authority to inform ourselves, on our own initiative, and take judicial notice of foreign law, even when the foreign law's applicability has not been called to the attention of the trial court. See Strout v. Burgess, 144 Me. 263, 68 A.2d 241, 12 A.L.R.2d 939 (1949); Harry L. Shernman & Sons v. Scranton Life Ins. Co., 125 F.2d 442 (3d Cir. 1942). See also Quickick, Inc. v. Quickick International, 304 So.2d 402 (1st Cir. 1974), writ denied, 305 So.2d 123 (1974), application denied, 306 So.2d 310 (1974). But see Cambre v. St. Paul Fire & Marine Ins. Co., 331 So.2d 585 (1st Cir. 1976), writ denied, 334 So.2d 434 (1976) (where the foreign law was not cited or relied upon in brief or oral argument). Furthermore, we recognize that the reason often stated for demanding notice in those states which require that the foreign law be pleaded, see Annot., 23 A.L.R.2d 1437, 1449, is that without such notice the opponent would not be warned beforehand that the court may take judicial notice of foreign law and might not be able to prepare himself on that law. Respondent in the instant case, although not given notice of relators' intention to rely on California law on the trial level, has been given sufficient opportunity to research the relevant law since the argument was raised in brief in the appellate court. Consequently, we may refer to California law to determine the status of funds derived from the sale of the California property.
A review of the applicable California law on joint tenancy shows:
"A joint interest is one owned by two or more persons in equal shares, by a title created by a single will or transfer, when expressly declared in the will or transfer to be a joint tenancy, or by transfer from a sole owner to himself and others, or from tenants in common to themselves, or to themselves and others, or from a husband and wife when holding title as community property or otherwise to themselves and others when expressly declared in the transfer to be a joint tenancy. . . " Cal.Civil Code, § 683.
The fact that a deed was taken in joint tenancy establishes a prima facie case that the property was in fact held in joint tenancy. Cox v. Cox, 82 Cal.App.2d 867,187 P.2d 23, 25 (1st Dist. 1947). Property held in joint tenancy cannot also be held as community property because certain incidents of the former would be inconsistent with the incidents of the latter. Tomaier v. Tomaier, 23 Cal.2d 754, 146 P.2d 905 (1944). Where community funds are used to purchase property, the taking of title in the name of the spouses as joint tenants is tantamount to a binding agreement between them that the same shall not thereafter be held as community property, but instead as a joint tenancy with all the characteristics *688 of such an estate. Siberell v. Siberell, 214 Cal. 767, 7 P.2d 1003, 1005 (1932).
Property held by husband and wife as joint tenants is held by each as owner of an undivided one-half interest therein in his separate right. Barba v. Barba, 103 Cal.App.2d 395, 229 P.2d 465 (2d Dist. 1951). Where property is acquired in the joint tenancy form it is presumed that the property was owned as joint tenants, not as the separate property of one party or the other. Donlon v. Donlon, 155 Cal. App.2d 362, 318 P.2d 189 (2nd Dist. 1957). And where the separate estate of either party provides the source of the funds for property taken in joint tenancy, it is presumed that a gift was given by the party furnishing the consideration to the other party. Donovan v. Donovan, 223 Cal. App.2d 691, 36 Cal.Rptr. 225 (2d Dist. 1964); Benam v. Benam, 178 Cal.App.2d 837, 3 Cal.Rptr. 410 (1st Dist. 1960).
The presumption arising from the form of a deed as a joint tenancy is rebuttable; however it may not be rebutted solely by evidence as to the source of the funds used to purchase the property. Gudelj v. Gudelj, 41 Cal.2d 202, 259 P.2d 656 (1953). It may only be rebutted by evidence tending to prove a common understanding or agreement between the parties that the character of the property was to be other than joint tenancy. Machado v. Machado, 58 Cal.2d 501, 375 P.2d 55, 58 (1962); Gudelj v. Gudelj, supra; Socol v. King, 36 Cal.2d 342, 223 P.2d 627 (1950).
The proceeds of property held in joint tenancy, in the absence of a contrary agreement, retain the character of the property from which they were acquired. Fish v. Security-First Nat. Bank, 31 Cal.2d 378, 189 P.2d 10 (1948); Goldberg v. Goldberg, 217 Cal.App.2d 623, 32 Cal.Rptr. 93 (2d Dist. 1963); In re Zaring's Estate, 93 Cal.App.2d 577, 209 P.2d 642 (2d Dist. 1949).
The record discloses that while Clara and Louie lived in Bastrop, Louisiana she worked as a nurse. Prior to their move to California in 1955, their family home was sold, the $6000 proceeds of which were divided equally between Clara and Louie. While in California Clara worked at a hospital. Louie testified that they kept their finances separate, that he deposited his money in a bank and savings and loan in his own name, and that he did not know what Clara did with her money. He also testified that his money alone was used to purchase the California property and that there "was absolutely no question" but that the Louisiana property was all purchased with the proceeds of the California property.
Without the presumption of the nature of property held in joint tenancy in California, relators clearly do not satisfy the strict and conclusive burden of proof that Clara's independent funds contributed to the purchase of the Louisiana property. (This would be so even with the benefit of relators' proffered evidence that Clara kept checking accounts in both their names).
In applying California law to the instant facts, we find that the California property held as joint tenants is presumed to be joint tenancy property. Therefore, both Clara and Louie held an undivided one-half interest in the property. Even though Louie contended his separate funds were used to purchase the California property, he offered no proof and makes no allegation that he and Clara agreed that although the joint tenancy form would be used, the property would remain his separate property. Therefore, he failed to rebut the presumption that a joint tenancy was intended. And since the California property was held in joint tenancy, each owning an undivided one-half interest, upon the sale of the property the proceeds retained the joint tenancy character. Consequently, half of the proceeds used to purchase the Louisiana property belonged to Clara and the other half to Louie.
In light of the foregoing, relators have satisfied the burden of showing, through strict and conclusive proof, that Clara actually contributed one-half of the funds used to purchase the pieces of Louisiana property. Therefore, relators are entitled to onehalf of the tracts of immovable property in *689 Morehouse Parish awarded to Louie A. Gathright, as sole owner, by the trial court, which were at issue before this court.
For the reasons assigned, the judgments of the lower courts are affirmed insofar as they held: (1) that relators had the burden of proving their mother's good faith; and (2) that Louie Gathright was in good faith throughout his marriage to Clara Pearl Breland Smith; and (3) that Clara Pearl Breland Smith was in bad faith. We hold that the "strict and conclusive" burden of proof was satisfied by relators, who are entitled to judgment decreeing them owners of onehalf of the immovables in Louisiana acquired by Louie Gathright and Clara Pearl Breland Smith, all at the cost of respondent.
This case is remanded to the district court for the formulation of a judgment in accordance with the views expressed herein.

On Rehearing
TATE, Justice.[*]
We granted the husband's application for rehearing.
We did so primarily in order to afford the husband an opportunity to cite California jurisprudence allegedly contrary to our interpretation of the California law relative to the acquisition of property in joint tenancy.
The California jurisprudence cited by us in our original opinion holds:
When property is acquired in joint tenancy during a marriage or otherwise, it is presumed that the property was acquired as joint tenants, each party owning one-half individually. Even if one joint tenant provides the funds, it is presumed that a gift was given by the party furnishing the consideration to the other party. If the parties are married, the property does not fall into the community but, rather, is acquired by each spouse one-half individually. This presumption may be rebutted only by proof of a common understanding or agreement between the parties, at the time of the acquisition of the property, that the character of the property was to be other than in joint tenancy.
On rehearing, the husband does not contest these principles of California law. Rather, he cites to us three decisions which purportedly show that these principles do not apply in instances where property is acquired by joint tenancy during a bad faith marriage.
The cited decisions do not so hold, and they are not authority for the proposition advanced. They concern distinguishable situations, arising during suits for separate maintenance or annulment between living spouses, where specific evidence was held by the trier of fact (in a direct attack upon the instrument relatively soon after its execution) to prove the intent to acquire for the community[1] or a fraudulent misrepresentation *690 by which separate property of an innocent spouse was conveyed to the wife,[2] thus rebutting the presumption that property acquired as joint tenants was intended to be acquired for the individual ownership of each spouse in one-half undivided interest.
Neither the rationales nor the holdings of the cited decisions are persuasive that we were in error in our appreciation of California law in our original opinion. We correctly then held that the presumption of separate ownership in each spouse (rather than of community ownership) created by the acquisition as joint tenants could not be rebutted, after one spouse's death, by the surviving spouse's testimony that, years earlier, the property had been acquired only with his funds, and by him with the intention that the property fall in the communitydespite the express declaration of joint tenancy importing to the contrary, signed by both spouses when alive (and especially in the absence of any testimony whatsoever that the deceased spouse had entered into this agreement with the requisite shared intention that the property fall into the community, despite the express declaration to the contrary at the time of its acquisition).
We are furnished no reason to disturb our original holding.
Accordingly, we reinstate our original decree.
DECREE ON ORIGINAL HEARING REINSTATED.
SUMMERS, C. J., dissents and assigns reasons.
MARCUS, J., dissents.
CULPEPPER, J., dissents for the reasons assigned by the Chief Justice.
SUMMERS, Chief Justice (dissenting).
Clara Pearl Breland was married to Alexander F. Smith in St. Tammany Parish, Louisiana, on April 20, 1920. Two children were born of this union: Margie, born March 19, 1922, and Talmadge, born May 24, 1924. Shortly after Talmadge was born Clara and Alexander separated and were never reconciled. Clara is said to have contracted a second marriage with John Turner on November 4, 1930 in Arkansas. She lived with him until sometime during the years 1933 or 1934 at which time they too separated.
Sometime thereafter Clara moved to Bastrop, Louisiana, where she resided continuously, holding herself out as a single woman and representing in deeds involving real estate transactions that she was the widow of Alexander Smith and also divorced from John Turner. With this official public record of her marital status and a like reputation in the community she met Louie Gathright. A courtship followed and in two years they were married on August 12, 1942, while Louie was on furlough from the army. When Louie was discharged in 1945 he returned to Bastrop. Thereafter he and Clara lived together as man and wife. No children were born of their relationship.
In 1955 the couple moved to Pomona, California. While in California, both worked. Clara was employed as a nurse and Louie was employed at Loud Machine Works. Louie's testimony, which the trial judge accepted, was to the effect that he and Clara kept their money separate and he did not know what Clara did with hers. The money he earned was deposited by him in the bank and in savings and loan accounts in his name. And, while the record *691 does indicate that Clara may have deposited funds earned by her in their joint names, it was not Louie's practice to do so.
During their residence in California, two pieces of real estate were purchased in Pomona, the deeds reciting that the grantees were "Louie A. Gathright and Clara P. Gathright, husband and wife, as joint tenants". In late 1967 and early 1968, they sold the California properties. The proceeds from these sales were banked by Louie and used to acquire three pieces of property in and around Bastrop, Louisiana. In 1968 they moved back to Bastrop, and a fourth piece of property was purchased there. These deeds recited that the purchasers were "Louie A. Gathright, a married man whose wife is Mrs. Clara Gathright, nee Breland." These four purchases involve the property which is the subject of this litigation.
In 1973 Clara died. It was not until Louie sought to settle with Margie and Talmadge, the children of Clara's first marriage, that he discovered that that first union had not been dissolved until 1963 when Alexander Smith died. He also learned at that time that Clara's second husband, John Turner, was alive and that they were not divorced at the time of his marriage to Clara in 1942.
Acting on these disclosures Louie instituted this declaratory judgment proceeding, alleging the facts already recited and praying for a declaration that the purported marriage between Clara and him was null and void, ab initio, and of no effect, and declaring him to be the sole owner of all property acquired during the "concubinage relationship."
The trial judge found that Clara was in bad faith and that Louie was in good faith at the time of their purported marriage, and until its termination by Clara's death. No civil effects from the purported marriage were held to flow in favor of Clara or in favor of her heirs by virtue of the marriage ceremony. Louie was therefore declared to be the owner of all property acquired by them from August 12, 1942 until Clara's death in 1973.
Clara's children, Margie and Talmadge, appealed to the second circuit and the judgment was affirmed. 352 So.2d 282. Certiorari was granted by this Court on their application. 353 So.2d 1333.
Before this Court relators assigned five errors by the trial court and Court of Appeal: 1) in the trial court requiring them to satisfy the burden of proving good faith; 2) in the finding by both courts that Louie Gathright was in good faith; 3) in the holding of the Court of Appeal that a constitutional issue could not be raised for the first time on appeal; 4) in the failure of the Court of Appeal to find that the burden of proof was unconstitutional; and 5) in both courts holding that the burden of proof was not satisfied.
In this Court's original opinion the issues thus presented were answered seratim, and the judgment of the Court of Appeal was reversed. This Court was of the opinion that Clara's heirs, Margie and Talmadge, had successfully discharged the burden by "strict and conclusive proof" that Clara had contributed to the funds used to purchase the Louisiana property.
1) Citing Lands v. Equitable Life Assurance Society of U. S., 239 La. 782, 120 So.2d 74 (1960), in its original opinion, this Court held that there is a presumption of the validity of a second marriage and the burden of proving invalidity is upon the party attacking that marriage. The presumption of validity, however, does not run in favor of a spouse who has been shown to have a prior undissolved marriage, unless that spouse can show that he or she contracted the subsequent marriage in good faith.
On the basis of this rule, our original opinion stated that the trial judge correctly applied the law by imposing the burden of proving Clara's good faith on her heirs once Louie proved that Clara had been previously married and was neither widowed nor divorced at the time of their purported marriage. I restate that holding with approval.
2) Where a married person knows that his spouse has been previously married, he *692 is not justified in entering the marriage solely on the spouse's word that she is divorced or widowed by the death of the former spouse; he is under a duty to investigate to determine whether the previous marriage was actually dissolved. See Succession of Chavis, 211 La. 313, 29 So.2d 860 (1947); Prieto v. Succession of Prieto, 165 La. 710, 115 So. 911 (1928); Succession of Taylor, 39 La.Ann. 823, 2 So. 581 (1887).
After Clara and John Turner separated in 1934, she moved to Bastrop in 1936. She held herself out to the community as a single woman. She bought real estate in June 1936 by deed which recited that she was divorced from her former husband, John Turner. In December 1936, she sold real property by deed which recited that she was married twice, that her first husband was deceased, and her second husband divorced. Approximately four years later she met plaintiff, whom she subsequently married after a two-year courtship. Plaintiff had the benefit of both her reputation in the community and the public records to support her assertion that she was free to remarry. Plaintiff was therefore justified in the reasonable belief that there were no legal impediments to their marriage. 352 So.2d 282.
3) and 4) In these two assignments it is asserted that the Second Circuit was in error in imposing an unconstitutional burden upon a bad faith wife of a putative marriage. The burden of "strict and conclusive proof" that she contributed to the funds used to purchase the property, and that these funds were obtained independently of the relationship or common endeavor of her putative husband, is not an unconstitutional denial of equal protection. The burden applies equally to a bad faith husband when he occupies the position of the wife in the case at bar.
5) The principal issue presented by this rehearing concerns whether the wife has discharged the burden of "strict and conclusive proof" that she contributed to the funds used to purchase the Louisiana property. To discharge this burden it is essential that she also demonstrate that the funds were obtained independently of the relationship or common endeavor of her putative husband.
Because it is undisputed that the funds used to purchase the Louisiana property were proceeds from the sales of the California properties the status of those funds is critical. A reference to the narrative of facts discloses that both Louie and Clara were employed in California. Evidently the trial judge accepted as credible Louie's testimony to the effect that he maintained his earnings separate and apart from those received by Clara from her employment. Further, Louie testified that only his funds were used to acquire the California property, and that it was his intention that the property acquired with those funds would belong to him. However, the deeds for those purchases recited that the property was sold to "Louie A. Gathright and Clara P. Gathright, husband and wife, as joint tenants."
In deciding the case on original hearing this Court relied upon California law to determine the status of the funds used to purchase the Louisiana properties; the court reasoned that because the California properties were taken in the names of Louie and Clara, husband and wife, as joint tenants, the presumption implicit in California law was that property held as joint tenants is held by each as owner of an undivided one-half interest therein in his separate right. At the same time the Court recognized that the presumption was rebuttable.
Our original opinion also found that under California law, the proceeds of property held in joint tenancy, in the absence of a contrary agreement, retain the character of the property from which they were acquired.
Relying on this understanding of the California law, this Court held that the funds realized from the sale of the California properties retained the characteristics of joint tenancy because of the recitals in the deeds by which the property was acquired. On this basis the Court concluded that the children of Clara satisfied the burden of showing, through strict and conclusive *693 proof, that Clara contributed one-half of the funds used to purchase the Louisiana property. Clara's children were therefore entitled to one-half of the Louisiana property.
Upon further consideration of this question on rehearing, my attention has been called to the California decision in Turknette v. Turknette, 100 Cal.App.2d 271, 223 P.2d 495 (1950). The facts of that case are very similar to the facts in the case at bar. In Turknette the plaintiff wife married the defendant in 1939, and a child was born of the union. In June of 1948 plaintiff discovered that defendant had entered into another marriage in April of 1948. At the trial it was also revealed that defendant had married a woman named Harriet Hobbs in June of 1938 and was not divorced from her until August 1940. Plaintiff therefore instituted an action for separate maintenance, alleging extreme cruelty. An answer was filed by defendant in which he denied that the parties were ever validly married. It is conceded that when defendant married plaintiff in 1939 he was in fact married to, and not divorced from, his first wife. While plaintiff and defendant were living together as husband and wife, and while plaintiff in good faith believed that she was married to defendant, they purchased a home in San Francisco and took title in joint tenancy.
In awarding the house to the plaintiff, who was found to be a good faith putative wife, the court referred to the "well-settled" California rule stated in Jansen v. Jansen, 127 Cal.App. 294, 15 P.2d 777 (1932), quoting as follows:
"Dispensing with any academic discussion or review of the authorities, it is now generally conceded and recognized that the courts are invested with full power to determine the status of the property of both or each of the spouses, regardless of the name of either in which title to such property stands, and the recitals of whatever transfers there may have been between the spouses regarding such property or in transfers to one or the other, are merely prima facie evidence of ownership, and raise only disputable presumptions as to whether such property is the separate or community property of the parties." 223 P.2d 500.
The Court, using as authority its inherent equity powers, held that:
"[W]here an unmarried couple live together as husband and wife, and where one, at least, honestly and in good faith believes he or she is married, he or she is a putative spouse and his or her property rights will be protected."
Accordingly, the California court awarded the plaintiff the entire property acquired by her and the defendant in joint tenancy.
A somewhat similar situation was involved in Crawford v. Summers, 12 Cal. App.2d 533, 55 P.2d 936 (1936), where plaintiff married defendant, a woman who had previously been married to one Charles Summers. Plaintiff testified that shortly before their marriage ceremony she told him she was divorced. Thereafter, while they were living together, plaintiff purchased California real property, stock, and an automobile, for which he paid. However, title was taken in the names of plaintiff and defendant as joint tenants.
A decree was entered declaring the marriage null and void. The trial judge found that the defendant held the property in trust for plaintiff, and that she had no interest therein. This decision was based on a finding that plaintiff was induced to marry defendant through her fraudulent representation that she was divorced, and upon the undisputed fact that when defendant received the property as joint tenant with plaintiff, she parted with nothing.
Thus the court decided that plaintiff had the right to assume he had a lawful wife, and when she acquired the property under a fraudulent pretense it was not necessary to recognize that she was the owner of a share where nothing of value had been received from her, not even the legality of her marriage with plaintiff.
As in Crawford v. Summers there is no showing that Clara parted with anything of value when she was named as a tenant in common with Louie in the California deeds.
*694 But for the fact that Clara and the two defendants in the instant case, Talmadge and Margie, willfully and intentionally perpetrated the deception on Louie, he would have been able to decide against acquiring the California property in joint tenancy. The bad faith of Clara, Talmadge, and Margie should not be rewarded by the technicality of the representations in the deeds.
Goff v. Goff, 52 Cal.App.2d 23, 125 P.2d 848 (1942), is another case which deals with the pertinent California law on an issue similar to that involved in the case before this Court. In an action by the husband for annulment of a marriage, the court found that after cohabiting for two years the parties entered into a marriage ceremony in September 1935. The action for annulment by the plaintiff alleged as grounds that defendant falsely and fraudulently represented to him that she was a single woman when in fact she was then married to another. This case again involved an invalid marriage wherein the husband was in good faith and the wife in bad faith. Upon discovering the invalidity, the husband convinced the concubine to convey to him all of her rights, title, and interest, if any, to the property acquired by him in their joint names after the marriage ceremony. Thereafter the husband sued to annul the marriage and defendant filed a cross-complaint in which she requested an equal division of the community property previously deeded to plaintiff after he discovered her perfidy.
In answer to defendant's contention that the court should have divided the property between her and the plaintiff, the court held:
"[I]t may be said that the authorities seem clear in their holding that a void marriage vests no rights in either of the parties to it so far as the property of the other is concerned in like manner as the rights conferred by a valid marriage. . . . Although we concede that the court had jurisdiction to divide the community property between the parties, nevertheless that jurisdiction did not make such action mandatory. Indeed, in the case at bar there is evidence warranting the conclusion on the part of the trial court that the property in question was not acquired through the joint efforts of the parties, but belonged solely to the respondent."
My reading of these cases and my understanding of the facts in this record lead me to the conclusion that, under California law, Clara as a bad faith wife had no claim to the California property and for that reason she could not assert any interest in the proceeds realized from the sale of that property. Those funds belonged entirely to Louie Gathright. When he used them to purchase the Louisiana property they were his separate funds and the Louisiana property belonged to him in full ownership, for there was in fact no legal marriage between him and Clara. There is no "strict and conclusive" proof that any contribution to this transaction was made by Clara with funds acquired by her independently of the bigamous relationship.
Because Clara was in bad faith she was not entitled to the civil effects of the null marriage and this disability attaches alike to her children, issue of another marriage. La.Civil Code arts. 117 and 118.
I respectfully dissent.
NOTES
[1] I. e., whether she had a honest and reasonable belief that the marriage was valid and that no legal impediment to it existed. See, e. g., Funderburk v. Funderburk, 214 La. 717, 38 So.2d 502, 504 (1949); Succession of Chavis, 211 La. 313, 29 So.2d 860 (1947); Succession of Hopkins, 114 So.2d 742 (1st Cir. 1959).
[2] Such rules are somewhat circular and usually of small intellectual assistance. Their mechanical application should not obscure efforts to determine validity of marriages and good faith of parties to invalid marriages.
[3] . See also Succession of Glover, supra (evidence showed that the woman claiming putative spouse status deliberately gave false testimony and, therefore, was unworthy of belief; she also had reason to believe her husband's assurances he was divorced were false and therefore should have engaged in a simple inquiry to determine his marital status); Dillon v. Traders and General Ins. Co., supra (evidence of a prior inconsistent statement was introduced into the record where she admitted she knew her husband was not divorced when she married him).
[4] The author was among the dissenters in Summerell v. Phillips, 258 La. 587, 247 So.2d 542 (1971), which held that the court of appeal could not declare an ordinance unconstitutional if unconstitutionality had not been pleaded in the district court. This was held even though the ordinance involved was enacted after judgment had been rendered in plaintiff's favor and was relied on by defendant on its motion for a new trial, which was granted. We required plaintiff, in spite of the prohibition against replicatory pleadings (C.C.P. 852) to file a pleading in the district court attacking the constitutionality of the ordinance.

The author would overrule Summerell v. Phillips, supra, and hold that a pleading attacking the constitutionality of a rule of law or its application in the trial court is not required when the rule is relied on as a defense, and that if there is no opportunity in the trial court to plead unconstitutionality, such plea is not essential.
Further, although we do not reach the issue, it does not appear that the "strict and conclusive proof" burden unconstitutionally discriminates against the wife.
The burden the trial judge imposed upon relators who were asserting their mother's interest in the four pieces of property was that set out in Keller v. Keller, 220 So.2d 745, 750 (1st Cir. 1969):
". . . [A] concubine or a wife in bad faith in a putative marriage may recover only those funds that she has contributed to the actual purchase of assets which she now claims to be an owner in indivision with her paramour or `husband'. There are two rules that burden her endeavor, namely: (1) the source of the funds which she contends were applied to the joint effort must be obtained independently of the concubinage or her common endeavor with the putative husband and, (2) she must produce strict and conclusive proof of the source of the funds before she can be afforded relief." (Emphasis added).
These two rules were apparently drawn from Guerin v. Bonaventure, 212 So.2d 459 (1st Cir. 1968), which thoroughly reviewed the jurisprudence on the subject of the rights of a concubine or paramour. Language in that case makes it clear that the burden of proof on the concubine is applied with equal force to the paramour:
"Our jurisprudence appears settled to the effect that predicated upon equitable principles, the claims of a paramour and concubine will be recognized and enforced with respect to joint or mutual commercial ventures, provided such enterprises arose independently of the illicit relationship. Heatwole v. Stansbury, 212 La. 685, 33 So.2d 196; Sparrow v. Sparrow, 231 La. 966, 93 So.2d 232; Foshee v. Simkin, La.App., 174 So.2d 915.
The rationale of the rule pronounced in the Heatwole, Sparrow and Foshee cases, supra (and the numerous authorities therein cited) is that where the concubinage is merely incidental to the business arrangement, the equitable rights of both parties will be recognized and enforced provided they be established by strict and conclusive proof. Stated otherwise, the rule is that if the commercial enterprise is independent of the illegal cohabitation, each party may assert his rights in the common endeavor.
In applying the rule, the courts have in effect permitted either concubine or paramour to establish what amounts to a partnership with the other party in the operation of a particular business or venture. . . ." 212 So.2d at 461. (Emphasis added).
In one such case a paramour (referred to by the court as a "concubine") was unable to produce the "strict and conclusive" proof required of him to obtain one-half of homestead savings account in his concubine's name which was accumulated during the concubinage. Heatwole v. Stansbury, 212 La. 685, 33 So.2d 196 (1947).
In oral argument relators referred to a case cited by respondent in his brief, The Texas Company v. Stewart, 101 So.2d 222 (Orl.App. 1958), writs denied, May 26, 1958. In that case, a husband who was found to be in bad faith in contracting a second marriage was still allowed to take one-half of the property acquired during the putative community with his good faith wife while her legal heirs took the other half. In that decision, however, the husband did not take in his own right; rather, he inherited as the surviving spouse of his legal wife, who normally would have shared the property acquired during the coexistence of the two marriages equally with the putative wife. See, e. g., Succession of Fields, 222 La. 310, 62 So.2d 495 (1952); Ray v. Knox, 164 La. 193, 113 So. 814 (1927); Patton v. Cities of Philadelphia and New Orleans, 1 La.Ann. 98 (1846). Therefore, while under the peculiar facts of The Texas Company a bad faith husband was allowed to take, the decision does not mean that a bad faith husband is not put to the same onerous burden of proof as a bad faith wife. In Keller v. Keller, supra, the male did prevail over the bad faith female, but the issue in the court of appeal was whether the trial judge erred in denying a new trial to the female, who urged that "new" evidence which had been within her knowledge for the eight years of the litigation in the trial court would show the male to have been in bad faith.
[*] Chief Judge William A. Culpepper, Court of Appeal, Third Circuit, participated in this decision as Associate Justice Ad Hoc sitting in the place of Chief Justice Sanders, retired.
[1] In Turknette v. Turknette, 100 Cal.App.2d 271, 223 P.2d 495 (1950), the plaintiff wife sued a husband for separate maintenance. She was awarded the family home, which had been acquired in joint tenancy. There, the trial court found that the property (which had been paid for primarily by the wife's earnings) was intended to be acquired by the community (and, under California law, could be awarded to one spouse in equitable settlement of the community), not in joint tenancy (in which case, the bigamous husband could not be divested of his one-half interest).

There was direct testimony that the wife had intended to acquire it for the community, which the (living) husband did not rebut. The court noted that the defendant husband "has committed a most cruel fraud upon plaintiff" and now "wants to take advantage of a technical rule of law and claim that he has a joint tenancy interest in the property which was largely purchased from plaintiff's earnings. The circumstances and inferences from the evidence demonstrate to a certainty that the challenged finding is amply supported." 223 P.2d 501.
In the present case, although the living husband testified of his intention to use "his" funds to acquire the property for himself, he did not testify of an understanding or agreement between his wife and himself as to this intentioneven assuming that California law would permit the self-serving testimony of a surviving spouse, after his wife had died, to rebut successfully the solemn and express declaration by both spouses, years earlier, that the property was acquired in joint tenancy, with its well-marked distinction under California law from property acquired for the community.
[2] See Crawford v. Summers, 12 Cal.App.2d 533, 55 P.2d 936 (1936) (direct suit between living husband and bigamous wife to require reconveyance to husband of property purchased in joint tenancy with the husband's funds not long after the marriage, because fraudulently transferred to bigamous wife solely upon her fraudulent misrepresentations that she had not been previously divorced).

The other (third) decision cited by the husband is completely inapplicable: Goff v. Goff, 52 Cal.App.2d 23, 125 P.2d 848 (1942) (suit to annul marriage; on annulment of marriage, wife not permitted to have recognized ownership in property acquired solely in the husband's name).